**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No._____ -CV-_____

JOHN F. LABRIOLA,

        Plaintiff,

v.


MIAMI-DADE COUNTY,

        Defendant.

_____/

## COMPLAINT

Plaintiff John F. Labriola (hereafter "Plaintiff" or "Mr. Labriola"), by and through his undersigned counsel, alleges as follows:

### OVERVIEW

1.      This is an action for declaratory, equitable, and monetary relief against a Florida chartered county. It is brought under 42 U.S.C. § 1983 and the United States Constitution.

2.      Because Mr. Labriola exercised his rights of speech, religion, and press under the aforementioned laws, Defendant Miami-Dade County (hereafter "the County" or "the Defendant") suspended him without pay for three days, ordered him to undergo extra (and punitive) training, and fired him.

3.      This case is much bigger than Mr. Labriola, much bigger than an employment dispute, and much more important than its financial implications, although those are important as well. This case is about the County's use of its dangerous "mute" button to silence religious speech that it doesn't like and to compel speech that it does like. It is also about the County's discrimination against one of its employees based on religion, as well as about the County's failure to follow its own policy.

4.      This is a classic case of unjustified subject-matter silencing by the government. The silencing was particularly effective because the County was Mr. Labriola's employer.

5.      In response to Mr. Labriola's Opinion Piece, the County suspended Mr. Labriola for

three days without pay and required him to undergo extra (and punitive) training which would have compelled him to speak things that he does not agree with and apologize for his views. When Mr. Labriola refused to accept the further punishment of the extra (and punitive) training, the County fired him.

6.     Mr. Labriola is a former low-ranking County employee.  He was a non-supervisory and non-policymaking employee. He did not work for an agency tasked with public safety. He was a clerical employee, a scrivener.

7.     Before suffering the adverse employment actions at the hands of the County, Mr. Labriola received high commendations for his work.

8.     Mr. Labriola wrote his Opinion Piece after-hours on his private time, as a private citizen, and published it in a privately owned publication.  Mr. Labriola did not identify his employer, job function, job title, job duties, or the fact or nature of his employment anywhere in the Opinion Piece.  The Opinion Piece addressed hotly contested issues of public concern, including the proposed Equality Act (proposed federal legislation) and transgenderism. Mr. Labriola holds sincere religious beliefs about those issues as a Christian.

9.     The County became aware of the Opinion Piece, did not like it, and immediately suspended Mr. Labriola without pay for three days.  After Mr. Labriola refused to accept further punishment, the County fired him.

10.     The Opinion Piece did not disrupt or impair Mr. Labriola's job performance or the County's governmental function. After Mr. Labriola was fired, the County's Human Resources and Fair Employment Practices Division ("HRFEP") reported that it "did not find any evidence to establish that [Mr. Labriola] was engaged in any harassing or discriminatory behavior based on any protected characteristic *within the workplace*" (Emphasis in the original) despite the fact that HRFEP interviewed "all of the employees that work[ed] with [Mr. Labriola] in [the] BCC Media Division." A true, correct, and complete copy of the HRFEP Report accompanies this Complaint and is fully incorporated herein as **Exhibit 1**.

11.     Nor did Mr. Labriola's employment position give him special access to information relevant to his Opinion Piece.  Mr. Labriola had no greater access to matters discussed in his Opinion Piece than that possessed by the public.

12.     For daring to exercise his First Amendment rights as a private citizen, Mr. Labriola was suspended, ordered to undergo extra (and punitive) training, and fired.

13.     The suspension, training order, and firing violated Mr. Labriola's rights of speech, religion, and press, and the County's own Implementing Order 7-45.

14.     All three adverse employment actions were taken pursuant to the County's official policy and were imposed by a County official with final policymaking authority.

15.     The County's unlawful actions jeopardize the core constitutional rights of every County employee and threaten such employees with punishment up to, and including, termination for simply exercising those rights in any manner similar to Mr. Labriola.

16.     Mr. Labriola brings this suit to protect his and others' constitutional rights.

17.     Mr. Labriola now sues under 42 U.S.C. § 1983 for the County's deprivation under color of State law of Mr. Labriola's rights secured by the U.S. Constitution. Mr. Labriola respectfully prays the Court to grant the equitable and legal relief set forth in the Prayer for Relief.

## PARTIES

18.     At all times relevant herein, Mr. Labriola was a U.S. citizen and resident of the United States and Miami-Dade County, Florida. Mr. Labriola currently resides in Citrus County, Florida, and is still a United States citizen. At all times relevant herein, Mr. Labriola was a Commission Media Aide within the Miami-Dade County Board of County Commissioners ("BCC"). Mr. Labriola is a Christian.

19.     Defendant Miami-Dade County, at all times herein, was and is a "public agency" as defined by 29 U.S.C. § 203(x) and an "Employer" as defined by 29 U.S.C. § 203(d).

20.     Defendant is subject to the jurisdiction of this Court and may be served with a copy of the summons and complaint through the Office of the Mayor at 111 N.W. 1st Street, 29th Floor, Miami, FL 33128.

## JURISDICTION AND VENUE

21.     The County is located within this judicial district and division. All of the events and omissions giving rise to the claims alleged herein occurred in this judicial district and division. Therefore, this Court has personal jurisdiction over the County. Furthermore, venue is proper in this Court and in this division under 28 U.S.C. § 1391(b).

22.     This Court has federal question jurisdiction over Mr. Labriola's claims under 28 U.S.C. §§ 1331, 1343(a)(3).

23.     This Court has the authority to grant the requested declaratory relief under 28 U.S.C. §

§ 2201 and 2202.

24.     This Court has the authority to grant the requested damages pursuant to 28 U.S.C. § 1343.

25.     This Court has the authority to award attorneys' fees under 42 U.S.C. § 1988.

**SPECIFIC FACTS RELEVANT TO ALL COUNTS IN THIS COMPLAINT**

26.     From June 2013 through April 13, 2021, Mr. Labriola worked as a Commission Media Aide within the Media Division. The Media Division is within the Office of the Chair. The Office of the Chair is within the BCC. The BCC is the County's legislative body.

27.     The Office of the Chair is under the purview of whatever commissioner happens to be serving as the BCC's chairperson. The Office rotates among commissioners every two years. For the period relevant to this Complaint (and today), the chairperson was (and is) District 12 Commissioner José "Pepe" Díaz.

28.     Chairman Díaz's Chief of Staff was Isidoro Lopez. Both Díaz and Lopez were supervisors over Mr. Labriola. Chairman Díaz had final decision-making authority over Mr. Labriola's employment.

29.     Mr. Labriola received performance awards for being an exemplary employee. True, correct, and complete copies of many of them accompany this Complaint and are fully incorporated herein as **Exhibit 2**.

30.     As a Commission Media Aide, Mr. Labriola worked in obscurity. He chiefly drafted and edited mundane press releases that did not have his name or contact information on them and which announced such miscellaneous things as a street renaming, a ribbon-cutting for a new library, a commissioner's next meeting with the public about COVID-19, the BCC's approval of a resolution concerning the Marlins settlement, a commissioner urging property tax relief for residents, and the construction of a new bus terminal. The press releases announced things that had happened or were going to happen: a new ordinance passed, a new program was created, or a commissioner would host some event. Mr. Labriola did not insert any of his opinions into the press releases. He only drafted and/or edited the releases at the direction of and under the review of other staff. True, correct, and complete copies of some of these press releases accompany this Complaint and are fully incorporated herein as **Exhibit 3**.

31.     He assisted all 13 commissioners' offices, as requested, in handling public records requests, drafting or editing press releases, and related tasks. He did not act as a spokesperson

4

for anyone, nor did his name appear on press releases as a contact person for the media. He did not issue any press releases without the prior approval and review from the respective commissioner's office staff. In short, he was a scrivener who drafted written documents pursuant to instructions and the direction of his supervisors and commissioners' staff, who subjected his drafts to edit and review. Additionally, press releases were not issued from his work email account but from a generic office account, bccmedia@miamidade.gov.

32.     Mr. Labriola was not in a supervisory, managerial, or policymaking position. He did not have authority to control the salary, schedule, work location, responsibilities, status, promotion, demotion, hiring, firing, discipline, or any other employment aspect of any County employee. He had no contact with the public as part of his work duties except in processing public records requests.

### Mr. Labriola's Religious Beliefs

33.     As a Christian, Mr. Labriola has sincere religious beliefs about human sexuality and using his talents to share God's truths. These beliefs are an essential part of his faith. He views the Bible as God's authoritative Word. His faith governs the way he thinks about human nature, the meaning of life, the ethical and moral standards that govern human conduct, marriage, gender, sexuality, morality, politics, and social issues, and it causes him to hold sincere religious beliefs in these areas.

34.     As a Christian, he believes that sex is fixed in each person from the moment of conception and cannot be changed, regardless of an individual's feelings or desires, and that marriage is between one man and one woman. (Genesis 1:26-27; 2:24; 5:1-3; 9:6; James 3:9; Matthew 19:1-12; Mark 10:6).

35.     Mr. Labriola believes that transgenderism, homosexual marriage, Drag Queen Story Hours, and crossdressing are sinful. He believes that he cannot affirm as true ideas and concepts that he deems untrue and sinful (including tenets of transgenderism), as this would dishonor God and violate Biblical injunctions against lying. For the same religious reasons, Mr. Labriola believes that he cannot refer to people by pronouns that do not match their biological sex.

36.     Mr. Labriola believes that Christians are commanded to preach God's truths. Matthew 28:16-20 (the Great Commission); Mark 16:14-18; Luke 24:44-49; John 20:19-23; Acts 1:1-8 and 10:39-42; 2 Timothy 4:2; and 1 Peter 3:15. Mr. Labriola believes that sharing God's truths

requires sharing even those biblical teachings that may be offensive to those who do not adhere to them.

37.      The portions of the Opinion Piece (discussed below) which addressed transgenderism, homosexual marriage, Drag Queen Story Hours, and crossdressing were Mr. Labriola's way of preaching about human sexuality. That fits under the umbrella of Mr. Labriola's religious obligation to preach what he believes are God's truths.

38.      Mr. Labriola believes he has a moral obligation to stand up for what he believes is the truth through the use of his writing talents. *See* Luke 12:48; *See also* The Parable of the Talents in Matthew 25:14-30 and Luke 19:11-27.

**Mr. Labriola Publishes the Opinion Piece as a Private Citizen**

39.      Mr. Labriola wrote an Opinion Piece in the March 2021 edition of the online newsletter "Sophie's Voice," which was published by Sophie's Publishing House, Inc. The title is "Aristophanes' Feminist Nightmare Is Our Reality." He wrote it as a private citizen on his private time regarding matters of great public concern.  A true, correct, and complete copy of the Opinion Piece accompanies this Complaint and is fully incorporated herein as **Exhibit 4**. Mr. Labriola was not paid to write the Opinion Piece.

40.      The March 2021 edition was the fourth and second-to-last edition of the short-lived Sophie's Voice as of today's date. Sophie's brick-and-mortar location in Miami closed after six months.

41.      In his Opinion Piece, Mr. Labriola expressed his personal opposition to the "Equality Act," which was – and is – a bill in Congress which would add sexual orientation and gender identity and expression to the list of protected categories under the Civil Rights Act of 1964.

42.      Mr. Labriola characterized the Equality Act as "Orwellian" and characterized what he sees as the negative would-be effects if it is enacted into law. He recalled that the Act "has been described as 'the most comprehensive assault on Christianity ever written into law.'" The gist of the Opinion Piece is twofold: 1) Mr. Labriola criticized what he believes would be the Act's promotion of abortion on demand, homosexual marriage, transgenderism, gender reassignment surgery, and Drag Queen Story Hours, among other things; and 2) He decried that the Act would destroy the free speech and free exercise rights "of anyone who dares defy the left's sexual and gender ideologies" by disagreeing with homosexuality and transgenderism – especially religious institutions, "Christian bakers," and "other honest

hardworking small business owners."

43.     Each of the topics that Mr. Labriola touched upon were – and are – topics of great public concern in our society.

44.     Mr. Labriola wrote the Opinion Piece on his own time (not during work hours) and as a private citizen (because it did not identify him as a County employee).

<strong>The County Learns of the Opinion Piece</strong>

45.     At 7:48 A.M. on March 3, 2021, a private citizen named Jonathan Edwards sent an email to staff from all 13 commission offices as well as at to least one person from the Mayor's Office and to one of Mr. Labriola's coworkers in the Media Division (Olga Vega), complaining about the Opinion Piece (hereafter, "Edwards Email"). Edwards attached the Opinion Piece. Ms. Vega promptly notified Mr. Labriola of this. A true, correct, and complete copy of the Edwards Email accompanies this Complaint and is fully incorporated herein as **Exhibit 5**.

46.     Edwards claimed that he found the Opinion Piece while reading an online newsletter for a local independent bookstore (Sophie's) as he was shopping for books and gifts. The online newsletter was Sophie's Voice. Edwards admitted that he "researched the author of [the Opinion Piece]" before finding out that Mr. Labriola was a County employee.

47.     Thirteen minutes later, Maggie Fernandez – one of the recipients of the Edwards Email and the Chief of Staff to Miami-Dade County District 5 Commissioner Eileen Higgins – forwarded the Edwards Email to Douglas "Doug" Hanks, a Miami Herald reporter. A true, correct, and complete copy of the Fernandez Email is fully incorporated into this Complaint as **Exhibit 5** along with the Edwards Email.

48.     Two days later, Miami Herald reporter Bianca Padró Ocasio published an article about the Opinion Piece in the Miami Herald. A true, correct, and complete copy of this article accompanies this Complaint and is fully incorporated herein as **Exhibit 6.**

49.     Absent knowing Mr. Labriola on a personal level, a reader of the Opinion Piece would have no way of linking Mr. Labriola to the County just by reading the Opinion Piece. Indeed, Jonathan Edwards learned that Mr. Labriola was a County employee only after researching him.

50.     Thus, the Miami Herald learned of the Opinion Piece only because 1) Edwards – who is a complete stranger to Mr. Labriola – found it in the obscure, short-lived online newsletter

of an obscure independent retail bookstore, 2) Edwards had to research Mr. Labriola to find out that he worked for the County, 3) Edwards emailed BCC staff and the Mayor's Office complaining about the Opinion Piece, 4) and one of those recipients – Maggie Fernandez, a County employee – leaked the Edwards Email and the Opinion Piece to a Miami Herald reporter.

51.     On March 5, 2021 – the same day as the Miami Herald article was published – the Human Rights & Fair Employment Practices Division of the Human Resources Department of Miami-Dade County ("HRFEP") received a letter from Orlando Gonzales ("Gonzales"), Executive Director of SAVE Inc., which is an LGBTQ+ organization. Gonzales, who was not a County employee, cited the March 5 Miami Herald article and called for Mr. Labriola's firing. Chairman Díaz was cc'ed on the letter. A true, correct, and complete copy of the Gonzales Letter accompanies this Complaint and is fully incorporated herein as **Exhibit 7.**

**The Suspension**

52.     On March 5, 2021 – the same day as the Miami Herald article's publication and the Gonzales Letter – Chairman Díaz suspended Mr. Labriola from work without pay for three days and required him to undergo extra (and punitive) diversity training, all in retaliation for the Opinion Piece. The suspension lasted from March 8 to March 10, 2021. The suspension and the training order were imposed without notice or an opportunity to be heard. Chairman Díaz's decision was not appealable. A true, correct, and complete copy of the Disciplinary Action Report ("DAR") wherein which the suspension and training order are contained accompanies this Complaint and is fully incorporated herein as **Exhibit 8.** This exhibit also includes relevant emails between Mr. Labriola and Chief of Staff Isidoro Lopez.

53.     In the DAR, Chairman Díaz criticized the Opinion Piece in vague, conclusory terms. Chairman Díaz only vaguely and conclusorily asserted that the Opinion Piece *might* be disruptive.

54.     In the DAR, Díaz also claimed that the unspecified "insulting statements" which Mr. Labriola allegedly made in the Opinion Piece are "unacceptable" and "inconsistent with long-standing anti-discrimination policies adopted by the Board of County Commissioners, including Miami-Dade County Implementing Order 7-45." Chairman Díaz issued this DAR despite Implementing Order 7-45 (hereafter "IO 7-45") explicitly prohibiting the County from discriminating against its employees on the basis of their exercise of constitutional rights and

on the basis of their religion.

55.     In the DAR, Díaz claimed that the Opinion Piece "at a minimum…exhibited poor judgment that reflects negatively on [Mr. Labriola's] public relations on behalf of the community." Chairman Díaz wrote this even though Mr. Labriola had no contact with the public as part of his regular duties other than in his processing of public records requests.

56.     In the DAR, Díaz admitted that Mr. Labriola had not previously "received a disciplinary action or a less-than-favorable performance evaluation."

57.     The DAR also claimed that Mr. Labriola violated three paragraphs of "the County's Personnel Rules." However, those Personnel Rules do not apply to Mr. Labriola. They are the "County Personnel Rules for the Classified Service" (a true, correct, and complete list of which accompanies this Complaint and is fully incorporated herein as **Exhibit 9**). As a "Commission Media Aide," Mr. Labriola was an "Exempt" employee, as confirmed by the DAR (first page, top right-hand corner) and the County Pay Plan.[1] "Exempt" employees are exempt from the County's Classified Service.[2] The only County policy mentioned in the DAR which could be used to punish "Exempt" employees is IO 7-45.

58.     Mr. Labriola served the three-day suspension without pay. He returned to work and to full-pay status on March 11 and remained there until his firing on April 13, 2021.

59.     On March 12, the Miami Herald published a second article, this time reporting on Mr. Labriola's suspension and training order. A true, correct, and complete copy of this article accompanies this Complaint and is fully incorporated herein as **Exhibit 10.**

60.     The County: (1) singled Mr. Labriola out with this suspension and (2) has not punished any employees who have expressed views that are contrary to Mr. Labriola's and/or who have criticized Mr. Labriola or other proponents of the Christian view of human sexuality.

**The Training Order, Human Resources Investigation, and the Firing.**

61.     Furthermore, in the DAR, Chairman Díaz ordered Mr. Labriola to undergo "training regarding the County's anti-discrimination policies." Mr. Labriola will refer to it as "extra (and

---

[1] 2021-2022 Miami-Dade County Pay Plan, p. 186: (available at https://www.miamidade.gov/humanresources/library/compensation-county-pay-plan.pdf)
[2] §§ 2-41, 2-47, and 2-47.1 of the Miami-Dade County Code of Ordinances; *See also* the Miami-Dade County Personnel and Payroll Reference, page 3 (available at https://www.miamidade.gov/humanresources/library/personnel-payroll-reference.pdf); *See also* the Miami-Dade County Leave Manual, page 12 (available at https://www.miamidade.gov/humanresources/library/compensation-leave.pdf).

punitive) 'diversity' training." Chairman Díaz and his Chief of Staff, Isidoro Lopez, claimed that the purpose of the training was merely to train Mr. Labriola on the County's anti-discrimination policies. **Ex. 8** pp. 2, 14, 15, 17.

62.     However, the training order was actually designed to punish Mr. Labriola for his Opinion Piece, to intimidate him, and to shut him up from espousing his views again. Mr. Labriola's speech was neither discriminatory nor harassing under IO 7-45, but his superiors did not like his views and wanted to prevent him from espousing them again. Therefore, the order to undergo the extra "diversity" training was for the same unlawful purpose as the three-day suspension: To intimidate, punish, and shut up Mr. Labriola for his speech and his beliefs.

63.     The extra (and punitive) "diversity" training would have forced Mr. Labriola to apologize for his beliefs, to affirm that a biological man can be a woman and vice versa (and other tenets of transgenderism), and to use "preferred pronouns" to which Mr. Labriola has religious objections. The County's diversity training modules are evidence of this. The diversity training issue is fleshed out in paragraphs 112-125, and those paragraphs are incorporated herein.

64.     The County singled Mr. Labriola out for this extra training since it was not regularly scheduled for all employees at that time.

65.     The County has not punished any employees who have expressed views that are contrary to Mr. Labriola's and/or who have criticized Mr. Labriola or other proponents of the Christian view of human sexuality, much less required them to undergo extra training.

66.     Mr. Labriola – by himself and through counsel – informed the County of the conflict between the extra training requirements and his religious beliefs three times. First, on March 19, 2021, his then-counsel, Dennis Grossman, expressed concern to Chief of Staff Lopez and fellow BCC Media Division employee Olga Vega that the adverse employment actions – including the extra training – violated Mr. Labriola's rights of speech and press under the First Amendment. A true, correct, and complete copy of that letter accompanies this Complaint and is fully incorporated herein as **Exhibit 11**. Second, on March 26, 2021, Mr. Grossman wrote a similar letter to County Attorney William "Bill" Candela, except that Mr. Grossman added that the adverse employment actions violated Mr. Labriola's free exercise right, too. A true, correct, and complete copy of that letter accompanies this Complaint and is fully incorporated herein as **Exhibit 12**. Finally, Mr. Labriola complained to Chief of Staff Lopez on March 27,

2021, that the extra training constituted discrimination and harassment against him due to his religious beliefs and that his undergoing said training would betray all other County employees who share those beliefs. **Ex. 8** p. 13.

67.     After Mr. Labriola refused to accept this further punishment, Chairman Diaz fired him on April 13, 2021. A true, correct, and complete copy of the termination letter accompanies this Complaint and is fully incorporated herein as **Exhibit 13**.

68.     HRFEP conducted an investigation to determine whether Mr. Labriola was engaging in harassing or discriminatory conduct in the workplace. It released its final report on May 4, 2021. A true, correct, and complete copy of the final report accompanies this Complaint and is fully incorporated herein as **Exhibit 1.** According to the final report, HRFEP interviewed "***all of the employees** that work with [Mr. Labriola] in BCC Media Division.*" (Emphasis added). Despite that, the report "did not find any evidence to establish that [Mr. Labriola] was engaged in any harassing or discriminatory behavior based on any protected characteristic ***within the workplace**.*" (Emphasis in the original). Nonetheless, the report irrationally concluded that Mr. Labriola's language in his Opinion Piece "did constitute a violation of County policies, including Implementing Order 7-45."

69.     The final report also reflects the County's strong and impermissible anti-religious bias by citing Mr. Labriola's stated belief that "there is no such thing as transgender" as a rationale for the adverse employment actions taken against him.

### Mr. Labriola's Subsequent Employment

70.     Since his termination, Mr. Labriola has been unable to secure full-time employment because of his unconstitutional termination and because of what has been written about him, as potential employers discover public news of his former employment with the County. Mr. Labriola has applied for multiple full-time jobs in his field across Florida for which he is qualified but has not been hired.

71.     He has been working part-time and freelance jobs, including sometimes two or three at a time. None of them comes even close to providing him the same amount of money that he was making as a Commission Media Aide for Miami-Dade County.

72.     Mr. Labriola continues to suffer reputational harm because of his wrongful termination by the County and the very public condemnation he suffered for his religious beliefs.

**COUNT I: FREE SPEECH: THE COUNTY VIOLATED THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION BY SUSPENDING MR. LABRIOLA WITHOUT PAY AND ORDERING HIM TO UNDERGO EXTRA (AND PUNITIVE) TRAINING.**

73.    Mr. Labriola refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

74.    Chairman Díaz acted under color of state law and under color of the County's policies when he took the adverse employment actions against Mr. Labriola.

**Elements of the Claim and Other Legal Rules.**

75.    The First Amendment provides: "Congress shall make no law…abridging the freedom of speech…" U.S. Const. Amend. I.

76.    "The proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) (plurality opinion).

77.    Under the First Amendment, the County could not punish Mr. Labriola for exercising his First Amendment rights. The fact that Mr. Labriola was an at-will employee does not change this. Mr. Labriola is entitled to reinstatement plus all of the other relief in the Prayer for Relief.

78.    There is a six-step *Pickering-Connick-Garcetti-Bryson* Test to determine whether an employer's actions the Free Speech Clause. First, the employee must prove that 1) he spoke as a private citizen 2) on a matter of public concern. If the employee proves those steps, then the employer must prove that 3) its legitimate interest in promoting the efficiency of public services it performs (its "efficiency interest") outweighs the employee's interest in commenting upon matters of public concern. If the employer proves the third step, then the employee must prove that 4) the employer took an adverse employment action against the employee 5) for which the employee's speech played a substantial or motivating factor (causation). If the employee proves the fourth and fifth steps, the employer must prove 6) that it would have taken the adverse employment action even in the absence of the employee's protected speech (a.k.a. the "same decision defense"). The first party which fails to carry its burden on a step loses. *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Bryson v. Waycross*, 888 F.2d 1562, 1565-66 (11th Cir. 1989) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) and *Connick v. Myers*, 461 U.S. 138 (1983)).

**The Opinion Piece Concerned Matters of Public Concern.**

79.    Mr. Labriola was suspended for writing his Opinion Piece – which he submitted for publication in an online newsletter. He shared some thoughts on many topics of great public concern, including his objections to transgenderism, homosexual marriage, and Drag Queen Story Hours. See paragraph 42. *Meriwether v. Hartop*, 992 F. 3d 492, 508 (6th Cir. 2021) (holding that opposition to transgenderism is a matter of public concern and recognizing the First Amendment right of a professor to refuse to call a transgender student by that student's "preferred pronoun").

80.    Whether or not the Opinion Piece contains controversial words is irrelevant to whether it deals with a matter of public concern.

81.    Any controversial words within the Opinion Piece cannot be isolated from the rest of the Opinion Piece. The Opinion Piece must be viewed as a whole. And as a whole, it addresses matters of public concern.

82.    The First Amendment protects a public employee's "vehement, caustic, and sometimes unpleasantly sharp" speech. *Stroes v. Town of Davie*, No. 18-62760-CIV-MORENO, 2019 U.S. Dist. LEXIS 87188, *19 (S.D. Fla. May 22, 2019) (Report and Recommendation adopted as the opinion of this Court at *Stroes v. Town of Davie*, No. 18-62760-CIV-MORENO (D.E. 29) (S.D. Fla. June 14, 2019))[3] (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

**Mr. Labriola Wrote His Opinion Piece as a Private Citizen, not as a Public Employee.**

83.    Writing the Opinion Piece was not within the scope of Mr. Labriola's official duties. He (1) wrote the Opinion Piece after work hours, and not at his workplace; (2) did not identify himself as a County employee; and (3) did not direct the Opinion Piece to his superiors or to any co-workers.

**Mr. Labriola's Free Speech Interest Outweighed the County's Efficiency Interest.**

84.    Mr. Labriola's speech, as an expression of public issues, rests on the highest rung of the hierarchy of First Amendment values. Thus, his interest in speaking was substantial.

85.    Mr. Labriola's interest prevails in this balancing test for eight reasons.

---

[3] The adoption of the Report and Recommendation is available on PACER but not on LEXIS Advance.

86.     First, HRFEP "did not find any evidence to establish that [Mr. Labriola] was engaged in any harassing or discriminatory behavior based on any protected characteristic *within the workplace*" after it interviewed all of his coworkers in the Media Division. Therefore, the Opinion Piece did not cause any workplace disruption.

87.     Second, from his suspension on March 5 until his termination on April 13 (inclusive), Mr. Labriola edited at least eighteen press releases. Since he had to work together with others on every single one of them, this is further evidence that the Opinion Piece did not disrupt Mr. Labriola's work or workplace relationships. He even received praise for the quality of his work during that time. See, for example, the praise he received from District 4 Commissioner Sally Heyman (a true, correct, and complete copy of which accompanies this Complaint and is fully incorporated herein as **Exhibit 14).**

88.     Third through fifth, Mr. Labriola did not work for a "paramilitary or quasi-military organization" that is charged with maintaining public safety (the sheriff's office, the police department, or the fire department), did not work in a supervisory or policymaking role, and did not directly contradict his own job requirements with his comments. Those facts alone are sufficient to give Mr. Labriola the victory in this balancing test.

89.     Mr. Labriola worked as a low-ranking employee in the BCC. He had no supervisory or policymaking role. Furthermore, his comments did not directly inhibit his own job. He was not tasked with promoting harmony within the community. He worked in obscurity, drafting and editing mundane press releases that did not bear his name or contact information. He had no contact with the public as part of his work duties except in processing public records requests. He was not a contact person for the media or a spokesperson for anyone. He did not issue any press releases without the prior approval and review from the respective commissioner's office staff. Press releases were not issued from his work email acccount but from a generic office account, bccmedia@miamidade.gov. There was no workplace disruption. His speech was not directed at a superior to which he owed personal loyalty and confidence. There is no way that someone could mistake Mr. Labriola's religious beliefs for the County's beliefs. There is no reason to conclude that Mr. Labriola's speech contradicted or somehow directly inhibited his own job.

90.     Sixth, in the Disciplinary Action Report, Chairman Díaz expressed concern about what he thought the public's perception of Mr. Labriola's speech would be. **Ex. 8** p. 2. However,

Chairman Díaz's concern about protecting the County's image or the County's bond with the public cannot justify the County's disciplinary action.

91.     Seventh, the County violated its own IO 7-45 when it discriminated against and unlawfully harassed Mr. Labriola for his exercise of constitutional rights. IO 7-45 is Miami-Dade County's "Equal Employment Opportunity Policy Prohibiting Unlawful Discrimination, Harassment, or Retaliation." It prohibits the County and its employees from taking adverse employment actions against an employee because of the employee's "exercise of a constitutional or statutorily protected right." IO 7-45 p. 1-2. Chairman Díaz took three adverse employment actions against Mr. Labriola in retaliation for Mr. Labriola's exercise of his constitutional rights to the freedom of speech, the free exercise of his religion, and the freedom of the press. Those actions unreasonably interfered with Mr. Labriola's work performance and adversely affected his employment opportunities. Altogether, Chairman Díaz's conduct constituted discrimination and unlawful harassment under IO 7-45. A true, correct, and complete copy of IO 7-45 accompanies this Complaint and is fully incorporated herein as **Exhibit 15**.

92.     Eighth, nothing that Mr. Labriola wrote in the Opinion Piece fit under any of the categories of prohibited employee activity in IO 7-45: "Discrimination," "unlawful harassment," "awful harassment," "sexual harassment," or "retaliation."

93.     Collectively, these eight reasons demonstrate that Mr. Labriola's Opinion Piece did not impair discipline by superiors, did not impair harmony among co-workers, did not have a detrimental impact on close working relationships which call for loyalty and confidence, did not impede the performance of his duties, did not interfere with the operation of the Media Division, did not undermine the mission of the Media Division, did not conflict with his responsibilities within the Media Division, and did not make use of the authority and public accountability which his role entailed.

94.     For the reasons above, the County cannot satisfy its burden of proving that its efficiency interest outweighed Mr. Labriola's Free Speech interest in writing his Opinion Piece.

**The Opinion Piece Substantially Motivated the Three-Day Suspension and Training Order, Which Were Each Adverse Employment Actions.**

95.     The three-day suspension without pay was an adverse employment action. It altered

important employment conditions by altering Mr. Labriola's compensation and by putting a suspension in his personnel file (thus affecting his prospects for promotion). It also would deter a person of ordinary firmness from continuing to exercise his or her right to free speech.

96.    The training order was an adverse employment action. It changed a condition of Mr. Labriola's employment. It was likely to intimidate Mr. Labriola into not expressing his views again. It also would deter a person of ordinary firmness from continuing to exercise his or her right to free speech.

97.    That the Opinion Piece was a substantial or motivating factor for the suspension and training order is beyond dispute.

98.    The County would not have suspended Mr. Labriola or ordered him to undergo extra training but for the Opinion Piece.

**The County Has Municipal Liability Under § 1983 For All Three Adverse Employment Actions Taken Against Mr. Labriola: The Suspension, The Order To Undergo The Extra Training, And The Firing.**

99.    The County is not immune from a § 1983 claim. Municipal liability attaches when the plaintiff's injury arises 1) because of an official, written municipal policy, 2) because of an informal municipal custom that is so widespread it amounts to a custom or usage with the force of law, 3) through a decision of a municipal official or employee with final policymaking authority, 4) through a final policymaker's ratification of a subordinate's decision, or 5) through a failure to adequately train or supervise employees. *Hoefling v. City of Miami*, 811 F.3d 1271, 1279-1280 (11th Cir. 2016).

100.    The County is liable because it took all three adverse employment actions pursuant to its policies: IO 7-45 and the unnamed county policies. Although Mr. Labriola's conduct did not actually fall under the prohibitions of IO 7-45 (See paragraph 92), what matters is that the County punished him under color of IO 7-45.

101.    Furthermore, Chairman Díaz exercised final policymaking authority when he took the adverse employment actions, as detailed in paragraphs 102-106.

102.    Mr. Labriola worked in the Media Division, which was within the Office of the Chair of the BCC. Chairman Díaz heads the Office of the Chair.

103.    IO 7-45 authorizes Chairman Díaz to take adverse employment actions against his subordinates.

104.    The BCC Chairperson shall "supervise all persons who shall serve as employees of the entire [BCC]…" Miami-Dade County Code of Ordinances § 2-01(2)(e). "An employee may be suspended…or dismissed by the head of his department or designee thereof…" Miami-Dade County Code of Ordinances § 2-47.

105.    The termination letter was on BCC letterhead and included the County's seal.

106.    Mr. Labriola could not appeal the adverse employment actions since they were not eligible for any administrative review. Chairman Díaz's decisions were final.

107.    The County also has municipal liability because any decision made by and any action taken by Chief of Staff Lopez against Mr. Labriola was ratified by Chairman Diaz. Lopez's decisions and actions also displayed Lopez's lack of adequate training and the County's failure to adequately supervise Lopez.

108.    Mr. Labriola respectfully prays the Court to grant the equitable and legal relief set forth in the Prayer for Relief.

**COUNT II: FREE SPEECH: THE COUNTY VIOLATED THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION BY FIRING MR. LABRIOLA FOR HIS REFUSAL TO UNDERGO COMPELLED SPEECH.**

109.    Mr. Labriola refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

110.    Chairman Díaz acted under color of state law and under color of the County's policies when he took the adverse employment actions against Mr. Labriola.

111.    As a public employee, Mr. Labriola had a First Amendment right to refuse to undergo compelled speech. *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2471-78 (2018). That right includes a right to refuse to undergo extra (and punitive) diversity training which would have required him to recant his beliefs and/or to affirm beliefs that he does not hold and/or to use "preferred pronouns" or other language to which he has a religious objection. *Hiers v. Bd. of Regents of the Univ. of N. Tex. Sys.*, No. 4:20-CV-321-SDJ, 2022 U.S. Dist. LEXIS 43617, *38-*43 (E.D. Tex. March 11, 2022).

112.    Mr. Labriola was fired for refusing to undergo the extra (and punitive) training. Thus, he was fired for refusing to undergo compelled speech. It was unconstitutional compelled speech for the County to fire Mr. Labriola when he refused to undergo the extra diversity training due to the fact that the extra diversity training would have required him to apologize

for his beliefs and/or affirm beliefs that he does not hold and/or use "preferred pronouns" (speech that he has religious objections to). The training modules are evidence of what the extra diversity training would have required him to do.

113.     The training would have included the session "Transgender Sensitivity and Inclusion," the training module for which accompanies this Complaint and is fully incorporated herein as **Exhibit 16**. The details of this module are in paragraphs 114-117.

114.     The module tells employees to "*take the pledge* to treat everyone with equal respect no matter their differences." **Ex. 16** p. 17. (Emphasis added). This can be construed so broadly as to prohibit all sorts of expression that the County does not like – even if it's outside of the workplace.

115.     The module coolly dismisses employees' religious and privacy objections to transgender bathroom policies by telling them that "also helpful is an attitude that indicates that [the use of bathrooms by persons who identify as transgender and which do not correspond to those persons' biological sex] is 'no big deal'" **Ex. 16** p. 31.

116.     The module tells employees that *using pronouns* that correspond to a person's biological sex rather than the person's "preferred" or "correct" pronoun contributes to a hostile work environment for a person who identifies as transgender, thus compelling speech that may violate employees' deeply held religious beliefs. **Ex. 16** p. 33 (Emphasis added).

117.     The module orders employees who have become aware that they have "offended" someone to "*start with an apology* [and] stop the offensive behavior immediately." **Ex. 16** p. 36. (Emphasis added).

118.     The training would have included the session "LGBTQ+ Sensitivity," a short description of which accompanies this Complaint and is fully incorporated herein **Exhibit 17**. This training would have coerced Mr. Labriola to use language that he has religious objections to, like pronouns that do not match a person's biological sex.

119.     The training would have included the session "Overview of the County's Anti-Discrimination Policy," the training module for which accompanies this Complaint and is fully incorporated herein as **Exhibit 18**. The module tells employees who have become aware that they have "offended" someone to "*start with an apology* [and] stop the offensive behavior immediately." **Ex. 18** at p. 25. (Emphasis added).

120.     The training would have forced Mr. Labriola to apologize for his beliefs, affirm that a

biological man can be a woman and vice versa, affirm other tenets of transgenderism, and use pronouns that do not match a person's biological sex, all in violation of his religious beliefs.

121. The training was intended to punish and intimidate Mr. Labriola. This is supported by the fact that the County had already taken a punitive action against him (the suspension).

122. The County singled Mr. Labriola out for this extra training since it was not regularly scheduled for all employees at that time.

123. The County has not punished any employees who have expressed views that are contrary to Mr. Labriola's and/or who have criticized Mr. Labriola or other proponents of the Christian view of human sexuality, much less required them to undergo extra training.

124. The County has municipal liability for the same reasons as in paragraphs 99-108, which are incorporated here.

125. Mr. Labriola respectfully prays the Court to grant the equitable and legal relief set forth in the Prayer for Relief.

## COUNT III: FIRST AMENDMENT OVERBREADTH: IO 7-45 AND THE UNNAMED COUNTY POLICIES UNDER WHICH THE COUNTY PUNISHED MR. LABRIOLA WERE UNCONSTITUTIONALLY OVERBROAD, BOTH FACIALLY AND AS APPLIED.

126. Mr. Labriola refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

127. Chairman Díaz acted under color of state law and under color of the County's policies when he took the adverse employment actions against Mr. Labriola.

128. The County acted under color of state law when it promulgated IO 7-45 and the unnamed County policies.

129. Mr. Labriola was suspended, ordered to undergo extra (and punitive) diversity training, and fired under IO 7-45 and other unnamed County policies.

130. IO 7-45 and the County's enforcement of it are overbroad because it restricts a substantial amount of constitutionally protected speech relative to its plainly legitimate sweep. The same goes for the unnamed County policies under which Mr. Labriola was punished. Both IO 7-45 and the unnamed county policies prospectively restrict employees' speech.

131. "In determining whether a public employer's policy that prospectively restricts speech is unconstitutionally overbroad, courts apply a modified version of the *Pickering-Connick* test. That test places a heavy burden on the government to 'show that the interests of

[the] potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government.'" *Little v. Palm Beach Cnty.*, 30 F.4th 1045, 1054 (11th Cir. 2022) (quoting *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (U.S. 1995)); *See also Stroes*, 2019 U.S. Dist. LEXIS 87188 at *27-*30.

132.    The County – but not Mr. Labriola – violated IO 7-45. See paragraphs 91-92. Mr. Labriola refers to and incorporates those paragraphs as though fully set forth herein. IO 7-45 is attached as **Exhibit 15**.

133.    For the County to punish Mr. Labriola under IO 7-45, Mr. Labriola's actions must have qualified as either "discrimination," "unlawful harassment," "awful harassment," "sexual harassment," or "retaliation." The County's definitions of those terms reach a substantial amount of constitutionally protected speech relative to their plainly legitimate sweep.

134.    The County's application of any of those terms to Mr. Labriola's actions chilled Mr. Labriola's speech and would deter other employees from engaging in similar constitutionally protected speech.

135.    For example, by defining "unlawful harassment" non-exhaustively and with terms like "*has the purpose or effect of* creating an intimidating, hostile, humiliating, or offensive work environment" and "*has the purpose or effect of unreasonably interfering with* a person's work performance" (Emphases added), the County can punish virtually any protected expression by its employees as "unlawful harassment."

136.    To the extent that the County classified Mr. Labriola's Opinion Piece or refusal to undergo extra (and punitive) diversity training as "discrimination," "unlawful harassment," "awful harassment," "sexual harassment," or "retaliation," the County unconstitutionally discriminated against Mr. Labriola for engaging in protected expression and restricted his expression.

137.    IO 7-45 and the unnamed policies and the County's enforcement of them are unconstitutionally overbroad (facially and as applied) and violated Mr. Labriola's right to free speech in violation of the First Amendment to the U.S. Constitution.

138.    Whatever the unnamed County policies say, Mr. Labriola did not violate them and/or they are inapplicable to Mr. Labriola to begin with.

139.    The County cannot show that the interests of the potential audiences and a vast group

20

of present and future employees in a broad range of present and future expression are outweighed by those expressions' necessary impact on the County's actual operation, at least not in Mr. Labriola's case.

140.     The County has municipal liability for the same reasons as in paragraphs 99-108, which are incorporated here.

141.     Mr. Labriola respectfully prays the Court to grant the equitable and legal relief set forth in the Prayer for Relief.

### COUNT IV: FREE EXERCISE: THE COUNTY VIOLATED THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION BY SUSPENDING MR. LABRIOLA AND ORDERING HIM TO UNDERGO EXTRA (AND PUNITIVE) TRAINING.

142.     Mr. Labriola refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

143.     Chairman Díaz acted under color of state law and under color of the County's policies when he suspended Mr. Labriola and ordered him to undergo the extra (and punitive) training.

144.     The First Amendment Free Exercise Clause provides, "Congress shall make no law…prohibiting the free exercise [of religion.]" This clause applies to the States and local governments through the Due Process Clause of the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940).

145.     There are two avenues through which a public employee may make a Free Exercise claim. The first is the *Pickering-Connick-Garcetti-Bryson* Test. *Draper v. Logan County Pub. Library*, 403 F. Supp. 2d 608, 621-23 (W.D. Ky. 2003) (citing *Shahar v. Bowers*, 114 F.3d 1097, 1111 n. 27 (11th Cir. 1997), and *Shahar v. Bowers*, 836 F. Supp. 859, 866 (N.D. Ga. 1993)); *Grainger v. Worley*, 2005 U.S. Dist. LEXIS 54163, *23 n.7 (M.D. Ala. Jan. 7, 2005); *Brown v. Polk County*, 61 F.3d 650, 658-59 (8th Cir. 1995). That test is laid out in Count I, except that "religious exercise" replaces "speech" for a Free Exercise claim and that the employee need not prove that employer "substantially burdened" his free exercise of religion. That test is incorporated here.

146.     Under the first avenue, Mr. Labriola's Free Exercise interest in writing his Opinion Piece prevails for the same reasons as his Free Speech interest prevails in Count I.

147.     The second avenue is if the public employee shows that the employer has burdened his or her sincere religious practice pursuant to a policy that is not "neutral" and/or not "generally

applicable." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. *2407, *2421-*2423 (2022). A government policy will not qualify as neutral if it is specifically directed at a religious practice. *Id.* (internal citation omitted). A policy can fail this test if it discriminates on its face or if a religious exercise is otherwise its object. *Id.* (internal citations omitted). A government policy will fail the general applicability requirement if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way, or if it provides a mechanism for individualized exemptions. *Id.* (internal citation omitted). Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny. *Id.* (internal citation omitted).

148.    Mr. Labriola has the sincere religious beliefs about human sexuality that are described in paragraphs 33-38 and which are incorporated herein.

149.    Mr. Labriola wrote the Opinion Piece out of his religious obligation to share God's truths and live out the Christian faith. Thus, the Opinion Piece was an "exercise of religion."

150.    The County: (1) singled Mr. Labriola out with this suspension and extra training and (2) has not punished any employees who have expressed views that are contrary to Mr. Labriola's and/or who have criticized Mr. Labriola or other proponents of the Christian view of human sexuality.

151.    Because of Mr. Labriola's sincere religious beliefs about human sexuality and because the County singled him out, the suspension and training order violated the Free Exercise Clause under the second avenue. Namely, they were not neutral or generally applicable. The County cannot justify this violation under strict scrutiny analysis.

152.    Furthermore, although Mr. Labriola need not prove that the County "substantially burdened" his free exercise of religion, it's worth mentioning that the County did so. The suspension and training order punished Mr. Labriola for engaging in religiously-mandated activity in the Opinion Piece (preaching God's truths).

153.    The County has municipal liability for the same reasons given in paragraphs 99-108, which are incorporated here.

154.    Mr. Labriola respectfully prays the Court to grant the equitable and legal relief set forth in the Prayer for Relief.

**COUNT V: FREE EXERCISE: THE COUNTY VIOLATED THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION BY FIRING MR. LABRIOLA.**

155.     Mr. Labriola refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

156.     Chairman Díaz acted under color of state law and under color of the County's policies when he fired Mr. Labriola.

157.     The firing violated the Free Exercise Clause through the second avenue mentioned in Count IV. Mr. Labriola has sincere religious beliefs about human sexuality. He refused to undergo the extra training out of his religious obligation to not (as he sees it) speak falsely about human sexuality. Thus, his refusal was an "exercise of religion."

158.     The County singled Mr. Labriola out for this extra training since it was not regularly scheduled for all employees. The County has not punished any employees who have expressed views that are contrary to Mr. Labriola's and/or who have criticized Mr. Labriola or other proponents of the Christian view of human sexuality.

159.     Because of Mr. Labriola's sincere religious beliefs about human sexuality and because the County singled him out, the firing violated the Free Exercise Clause under the second avenue. Namely, it was not neutral or generally applicable. The County cannot justify this violation under strict scrutiny analysis.

160.     It's also worth reiterating that the extra training was compelled speech. See Count II.

161.     Furthermore, although Mr. Labriola need not prove that the County "substantially burdened" his free exercise of religion, it's worth mentioning that the County did so. The firing punished Mr. Labriola for not engaging in religiously-prohibited activity (i.e., for not undergoing the extra training).

162.     The County has municipal liability for the same reasons given in paragraphs 99-108, which are incorporated here.

163.     Mr. Labriola respectfully prays the Court to grant the equitable and legal relief set forth in the Prayer for Relief.

**COUNT VI: FREE SPEECH AND FREE EXERCISE: THE COUNTY VIOLATED THE FREE SPEECH AND FREE EXERCISE CLAUSES OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION BY IMPOSING AN UNCONSTITUTIONAL CONDITION UPON MR. LABRIOLA'S EMPLOYMENT.**

164.     Mr. Labriola refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

165.     Chairman Díaz acted under color of state law and under color of the County's policies when he took the adverse employment actions against Mr. Labriola.

166.     By conditioning Mr. Labriola's continued employment on his willingness to surrender his free speech and free exercise rights via the extra (and punitive) diversity training, the County imposed an unconstitutional condition upon his public employment in violation of the First Amendment.

167.     The County has municipal liability for the same reasons as in paragraphs 99-108, which are incorporated here.

168.     Mr. Labriola respectfully prays the Court to grant the equitable and legal relief set forth in the Prayer for Relief.

**COUNT VII: THE COUNTY VIOLATED THE FREEDOM OF THE PRESS UNDER THE U.S. CONSTITUTION BY SUSPENDING MR. LABRIOLA AND ORDERING HIM TO UNDERGO EXTRA (AND PUNITIVE) TRAINING.**

169.     Mr. Labriola refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

170.     Chairman Díaz acted under color of state law and under color of the County's policies when he took the adverse employment actions against Mr. Labriola.

171.     "Congress shall make no law…abridging the freedom…of the press." U.S. Const. Amend. I.

172.     The Free Press Clause is incorporated against state and local governments. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 500 (1952). It provides broad constitutional protections for the press.

173.     Beyond mere freedom from prior restraint, the Free Press Clause recognizes the primary place that a truly free press must hold as the heartbeat of a healthy democracy. *See Grosjean v. American Press Co*., 297 U.S. 233, 248 (1936).

174.     "If the Free Press guarantee meant no more than freedom of expression, it would be a

constitutional redundancy." [Then-Supreme Court Justice] Potter Stewart, "*Or of the Press*," 26 Hastings L.J. 631 (1975).

175.    "That the First Amendment speaks *separately* of freedom of speech and freedom of the press is no constitutional accident, but an acknowledgment of the critical role played by the press in American society." *Houchins v. KQED*, 438 U.S. 1, 17 (1978) (Stewart, J., concurring) (emphasis added).

176.    "[F]reedom of the press is a '*fundamental personal right…not confined to newspapers and periodicals*. It necessarily embraces pamphlets and leaflets…*The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion*.'" *Branzburg v. Hayes*, 408 U.S. 665, 704 (1972) (Emphases added). Today, such publications would include opinion pieces and the publication of blog posts and videos to personal and social media websites.

177.    Mr. Labriola wrote the Opinion Piece for Sophie's Voice – a vehicle of information and opinion – as a private citizen on his own time. Mr. Labriola enjoys the full, independent, and robust protection of the Free Press Clause.

178.    The Free Press Clause extends equal protections to the "lonely pamphleteer" and the "large metropolitan publisher" alike. *Branzburg*, 408 U.S. at 704.

179.    The County violated Mr. Labriola's Free Press right by suspending him and ordering him to undergo extra (and punitive) training for writing his Opinion Piece.

180.    The County has municipal liability under § 1983 for the same reasons given in paragraphs 99-108, which are incorporated here.

181.    Mr. Labriola respectfully prays the Court to grant the equitable and legal relief set forth in the Prayer for Relief.

**PRAYER FOR RELIEF**

Mr. Labriola respectfully requests that this Court enter judgment against Defendant and provide him with the following relief:

ON ALL CAUSES OF ACTION:

182.    A declaration that the County violated Mr. Labriola's right to free speech when it 1) suspended him without pay, 2) ordered him to undergo extra (and punitive) training, and 3) fired him;

183.    A declaration that the County violated Mr. Labriola's right to the free exercise of his religion when it 1) suspended him without pay, 2) ordered him to undergo extra (and punitive) training, and 3) fired him;

184.    A declaration that the County violated Mr. Labriola's right to the freedom of the press when it suspended him without pay and ordered him to undergo extra (and punitive) training;

185.    A declaration that IO 7-45 and the unnamed County policies are unconstitutionally overbroad;

186.    To grant Mr. Labriola compensatory damages, including actual, consequential, and incidental financial losses. These shall include – but are not limited to – backpay, benefits (including, but not limited to, medical and pension benefits), and other compensation, plus prejudgment interest;

187.    To grant Mr. Labriola damages proximately caused by the pain, anguish, embarrassment, and humiliation resulting from the unconstitutional actions taken against him;

188.    To grant Mr. Labriola non-economic damages in an amount according to proof at trial;

189.    To grant Mr. Labriola nominal damages;

190.    To grant Mr. Labriola punitive damages;

191.    To grant Mr. Labriola's counsel attorneys' fees and costs associated with bringing this action in accordance with the law;

192.    To purge every reference to this entire incident – including the County's unconstitutional actions – from Mr. Labriola's personnel file and employment record;

193.    To permanently enjoin the County, its officers, employees, and managing agents operating in active concert with the County, from taking adverse employment actions – including diversity training which would compel employees to say things that they disagree with – against employees who share Mr. Labriola's beliefs about human sexuality, including

those employees who share those beliefs but for different religious or non-religious reasons;

194.    To permanently enjoin the County, its officers, employees, and managing agents operating in active concert with the County, from enforcing IO 7-45 and the unnamed County policies, which are unconstitutionally overbroad;

195.    To reinstate Mr. Labriola to his former position;

196.    After Mr. Labriola is reinstated, to permanently enjoin the County, its officers, employees, and managing agents operating in active concert with the County, from taking any further adverse employment actions against him for his Opinion Piece and for any other future exercise of his First Amendment rights to freedom of speech, the free exercise of his religion, and his freedom of the press; and

197.    To grant such other and further relief as the Court may deem proper.

### JURY TRIAL

Mr. Labriola demands a trial by jury with respect to all claims so triable.

DATED this third day of October, 2022.

Respectfully submitted,

/s/ Alexander Bumbu
Alexander Bumbu
Southern District of Florida Bar Number 1024989
Florida Bar Number 1024989
**PACIFIC JUSTICE INSTITUTE**
1021 Ives Dairy Rd.
Bldg. 3, Ste. 115
Miami, FL 33179
(786) 496-3946
abumbu@pji.org
No facsimile number
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of October, 2022, I filed a true and accurate copy of

the foregoing document with the Clerk of Court using the CM/ECF system, which automatically

sends an electronic notification to the counsel and parties of record on the Service List below.

/s/ Alexander Bumbu

**SERVICE LIST**

Miami-Dade County
Office of the Mayor
Stephen P. Clark Center
111 N.W. 1st Street
29th Floor
Miami, FL 33128
mayor@miamidade.gov
*Defendant*