**Exhibit 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:22-cv-23196-PCH

JOHN F. LABRIOLA,

       Plaintiff,

v.

MIAMI-DADE COUNTY,

       Defendant.

_____/

**Declaration of John F. Labriola in Support of Motion for Summary Judgment**

I, JOHN F. LABRIOLA, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following are true, to the best of my knowledge and belief:

1. I am the plaintiff in this action.

2. I make this declaration in support of my Motion for Summary Judgment. I make this declaration based on personal knowledge. I am competent to testify to the matters set forth herein, and if called upon to testify before this court, I will affirm them under oath.

3. I am a Christian.

4. At all times relevant herein, I was a U.S. citizen and resident of the United States and Broward County, Florida. I currently reside in Citrus County, Florida, and am still a United States citizen. At all times relevant herein, I was a Commission Media Aide within the Miami-Dade County Board of County Commissioners ("BCC").

5. All of the events and omissions giving rise to the claims alleged herein and in the Amended Complaint occurred in Miami-Dade County, Florida ("the County").

**My Job With the County**

6. From June 2013 through April 14, 2021, I worked as a Commission Media Aide within the Media Division. The Media Division is within the Office of the Chair. The Office of the Chair is within the BCC. The BCC is the County's legislative body.

7. The Office of the Chair is under the purview of whatever commissioner happens to be serving as the BCC's chairperson. The Office of the Chair rotates among commissioners every

two years. For the period relevant to this case, the chairperson was Jose "Pepe" Diaz (hereafter, "Former Chairman Diaz").

8. This was the chain of command from top to bottom: Former Chairman Diaz, Former Chairman Diaz's Chief of Staff Isidoro Lopez ("Mr. Lopez"), BCC Media Division Executive Director Olga Vega ("Ms. Vega"; she was my immediate supervisor), and me.

9. I received performance awards for being an exemplary employee. True, correct, and complete copies of many of them were already filed as ECF No. 8-1.

10. As a Commission Media Aide, I was a low-level, behind-the-scenes employee.

   a. I did not have a supervisory, managerial, or policymaking role.
   b. I was not anyone's spokesperson.
   c. While I performed various duties, my name was not associated with them and I was not a face for anyone.
   d. I wrote press releases for commissioners within the confines of instructions that commissioners' staff gave me. Commissioners' staff gave me the general theme and subjected my drafts to final review before they were released to the press. My name and contact information did not appear on press releases nor was authorship attributed to me.
   e. Press releases were not issued from my work email account but from a generic office account, bccmedia@miamidade.gov.
   f. At various times throughout my tenure, I drafted messages for various commissioners under their names which were published in their newsletters, brochures, and other publications, but my name did not appear in any of them and authorship was not attributed to me. The commissioners and/or their staffs gave me the topic or general theme and I drafted the messages accordingly. Each message was then reviewed by the commissioner's staff for review and final approval, following any additional edits by the commissioner or staff members.
   g. I worked on Former Chairman Diaz's inauguration speech for his installation as chairman in January 2021. However, my immediate supervisor – Olga Vega – gave me the outline/content of the speech which I edited and polished. The speech was not attributed to me.
   h. During the chairpersonship of Audrey Edmonson (who preceded Jose Diaz as

the chairperson), I drafted talking points for Edmonson's speeches. One of Edmonson's staff members directed what I would write for those speeches.

i. I did not insert my views into any of these writings.

j. As pertains to all the written content (including the prepared speeches), I was a scrivener who drafted written documents pursuant to instructions and the direction of my supervisors and commissioners' staff.

k. I assisted all 13 commissioners' offices, as requested, in handling public records requests, either by retrieving the responsive documents or by directing requestors to another person when necessary.

l. I forwarded media inquiries and reporters' interview requests to the appropriate commissioner's office.

m. On some weekends during the BCC chairpersonship of Audrey Edmonson, I worked at food giveaways organized by Chairwoman Edmonson. I would help set up the place and/or would be a part of the assembly line filling boxes of food that would be distributed to the public. Even there, my contact with the public was minimal.

n. On rare occasions during the BCC chairpersonship of Audrey Edmonson, I would take pictures of Chairwoman Edmonson at some event (like a picture showing her serving food to the community) and post that picture on her official social media. I did this only when the employee who normally handled Edmonson's social media was unavailable. My name and contact information did not appear on those posts.

o. I did not have authority to control the salary, schedule, work location, responsibilities, status, promotion, demotion, hiring, firing, discipline, or any other employment aspect of any County employee.

**My Religious Beliefs**

11. As a Christian, I have sincere religious beliefs about human sexuality and using my talents to share God's truths. These beliefs are an essential part of my faith. I view the Bible as God's authoritative Word.

12. My faith governs the way I think about human nature, the meaning of life, the ethical and moral standards that govern human conduct, marriage, gender, sexuality, morality, and

social issues, and it causes me to hold sincere religious beliefs in these areas. I believe that sex is fixed in each person from the moment of conception and cannot be changed, regardless of an individual's feelings or desires, and that marriage is between one man and one woman. (Genesis 1:26-27; 2:24; 5:1-3; 9:6; James 3:9; Matthew 19:1-12; Mark 10:6).

   a. I have strong religious conscience-based objections to transgender ideology, homosexual marriage, and Drag Queen Story Hours. I believe that I cannot affirm as true ideas and concepts that I believe are untrue and immoral (including tenets of transgender ideology), as this would dishonor God and violate Biblical injunctions against dishonesty.

   b. For the same religious reasons, I believe that I cannot refer to people by pronouns that do not match their biological sex.

   c. I believe that Christians are commanded to preach God's truths. Matthew 28:16-20 (the Great Commission); Mark 16:14-18; Luke 24:44-49; John 20:19-23; Acts 1:1-8 and 10:39-42; 2 Timothy 4:2; and 1 Peter 3:15. I believe that sharing God's truths requires sharing even those Biblical teachings that may be offensive to those who do not adhere to them.

13. The portions of the Opinion Piece (discussed below) which addressed transgenderism, homosexual marriage and Drag Queen Story Hours were my way of preaching about human sexuality. That fits under the umbrella of my religious obligation to preach what I believe are God's truths.

14. I believe that I have a moral obligation to stand up for what I believe is the truth through the use of my writing talents. *See* Luke 12:48; *See also* The Parable of the Talents in Matthew 25:14-30 and Luke 19:11-27.

### I Write the Opinion Piece

15. I wrote an Opinion Piece in the March 2021 edition of the online newsletter "Sophie's Voice," which was published by Sophie's Publishing House, Inc. The title is "Aristophanes' Feminist Nightmare Is Our Reality." A true, correct, and complete copy of the Opinion Piece has already been filed as ECF No. 8-3.

16. I wrote the Opinion Piece on my private time.

17. The Opinion Piece did not identify me as a County employee.

18. I was not paid to write the Opinion Piece.

19. I believe that the March 2021 edition was the fourth and second-to-last edition of the short-lived Sophie's Voice as of today's date. I believe that Sophie's brick-and-mortar bookstore in Miami closed after six months.

20. In my Opinion Piece, I expressed my personal opposition to the "Equality Act," which was – and is – a bill in Congress which would add sexual orientation and gender identity and expression to the list of protected categories under the Civil Rights Act of 1964.

21. I characterized the Equality Act as "Orwellian" and discussed what I see as the negative would-be effects if it is enacted into law. I cited the fact that the Act "has been described as 'the most comprehensive assault on Christianity ever written into law.'"

22. The gist of the Opinion Piece is twofold:

    a. I criticized what I believe would be the Act's promotion of abortion on demand, homosexual marriage, transgenderism, gender reassignment surgery, and Drag Queen Story Hours, among other things; and

    b. I decried that the Act would destroy the Free Speech and Free exercise Rights "of anyone who dares defy the left's sexual and gender ideologies" by disagreeing with homosexuality and transgenderism – especially religious institutions, "Christian bakers," and "other honest hardworking small business owners."

23. While some might find some of what I wrote provocative or offensive, my words nonetheless characterized my religious and legal concerns about the Equality Act, homosexual marriage, transgenderism, and Drag Queen Story Hours, and they were written within that larger context.

24. Knowledge of my Opinion Piece by my colleagues, supervisors and members of the BCC did not negatively impact my ability to do my job effectively. As an example, then-Commissioner Sally Heyman personally praised me on March 24, 2021, for my work on a press release that she requested – long after the Jonathan Edwards email (March 3) and the Miami Herald articles (March 5 and 12). Heyman's email is in ECF No. 8-14.

### The County Learns of the Opinion Piece

25. At 7:48 A.M. on March 3, 2021, a private citizen calling himself Jonathan Edwards sent an email to staff from all 13 commission offices as well as at to least one person from the Mayor's Office and to one of my coworkers in the Media Division (Olga Vega), complaining

about the Opinion Piece (hereafter, "Edwards Email"). Edwards attached the Opinion Piece. Ms. Vega promptly notified me of this. A true, correct, and complete copy of the Edwards Email has already been filed as ECF No. 8-4.

26. Edwards is a stranger to me. I do not know Edwards personally.

27. Edwards claimed that he found the Opinion Piece while reading an online newsletter for a local independent bookstore (Sophie's) as he was shopping for books and gifts. The online newsletter was Sophie's Voice.

28. Edwards admitted that he "researched the author of [the Opinion Piece]" before finding out that I was a County employee.

29. Thirteen minutes later, Maggie Fernandez – one of the recipients of the Edwards Email and the Chief of Staff to Miami-Dade County District 5 Commissioner Eileen Higgins – forwarded the Edwards Email to Douglas "Doug" Hanks, a Miami Herald reporter. A true, correct, and complete copy of the Fernandez Email has already been filed as ECF No. 8-4.

30. Two days later, Miami Herald reporter Bianca Padró Ocasio published an article about the Opinion Piece in the Miami Herald. A true, correct, and complete copy of the article has already been filed as ECF No. 8-5.

31. Absent knowing me on a personal level, a reader of the Opinion Piece would have no way of linking me to the County just by reading the Opinion Piece. Indeed, Jonathan Edwards learned that I was a County employee only after researching me.

32. Thus, the Miami Herald learned of the Opinion Piece only because 1) Edwards – who is a complete stranger to me – found it in the obscure, short-lived online newsletter of an obscure independent retail bookstore, 2) Edwards had to research me to find out that I worked for the County, 3) Edwards emailed BCC staff and the Mayor's Office complaining about the Opinion Piece, 4) and one of those recipients – Maggie Fernandez, a County employee – leaked the Edwards Email and the Opinion Piece to a Miami Herald reporter.

33. On March 5, 2021 – the same day the Miami Herald article was published – the Human Rights & Fair Employment Practices Division of the Human Resources Department of Miami-Dade County ("HRFEP") received an emailed letter from Orlando Gonzales ("Gonzales"), Executive Director of SAVE Inc., which is an LGBTQ+ organization. A true, correct, and complete copy of the Gonzales Letter has already been filed as ECF No. 8-6.

34. Gonzales, who was not a County employee, cited the March 5 Miami Herald article

and called for my firing. Former Chairman Diaz was cc'ed on the letter.

### The Suspension

35. On March 5, 2021 – the same day as the Miami Herald article's publication and the Gonzales Letter – Former Chairman Diaz suspended me from work without pay for three days and required me to undergo training, all in retaliation for the Opinion Piece.

36. The suspension lasted from March 8, 2021, to March 10, 2021, both of those days inclusive.

37. The suspension and the training order were imposed without notice or an opportunity to be heard.

38. A true, correct, and complete copy of the Disciplinary Action Report ("DAR") wherein which the suspension and training order are contained has already been filed as ECF No. 8-7. ECF No. 8-7 also includes relevant emails between me and Mr. Lopez.

39. Former Chairman Diaz issued this DAR despite Implementing Order 7-45 (hereafter "IO 7-45") explicitly prohibiting the County from discriminating against its employees on the basis of their exercise of constitutional rights and on the basis of their religion.

40. In the DAR, Former Chairman Diaz criticized the Opinion Piece in vague, conclusory terms. Former Chairman Diaz only vaguely and conclusorily asserted that the Opinion Piece *might* be disruptive.

41. In the DAR, Former Chairman Diaz also claimed that the unspecified "insulting statements" which I allegedly made in the Opinion Piece were "unacceptable" and "inconsistent with long-standing anti-discrimination policies adopted by the Board of County Commissioners, including Miami-Dade County Implementing Order 7-45."

42. In the DAR, Former Chairman Diaz claimed that the Opinion Piece "at a minimum…exhibited poor judgment that reflects negatively on [my] public relations on behalf of the community." Former Chairman Diaz wrote this even though I had very little contact with the public as part of my regular duties (see paragraph 10 of this Declaration).

43. Prior to serving the suspension, I emailed Mr. Lopez objecting to it. On March 8, 2021 – the first day of my suspension – Mr. Lopez told me that "as an exempt employee [I] am not entitled to an administrative hearing under section 2-47 of the Miami Dade County Code to challenge the three day suspension. Accordingly, your suspension from Monday March 8, 2021 through Wednesday March 10, 2021 stands." ECF No. 8-7 at p. 9. Mr. Lopez reiterated

on March 25, 2021, that I was "an at-will employee with no civil service appeal rights that may be dismissed from employment at any time without cause." ECF No. 8-7 at p. 15.

44. From my return from suspension on March 11, 2021, until my termination on April 14, 2021 (inclusive), I worked on many press releases and other assignments. I had to work with others on those assignments.

45. On March 12, 2021, the Miami Herald published a second article, this time reporting on my suspension and training order. A true, correct, and complete copy of this article has already been filed as ECF No. 8-9.

### The Training Order, Human Resources Investigation, and the Firing.

46. Furthermore, in the DAR, Former Chairman Diaz ordered me to undergo "training regarding the County's anti-discrimination policies."

47. I asserted – and the County agrees – that the DAR forced me to undergo the training program "Overview of the County's Anti-Discrimination Policy," also known as "IO 7-45 training." This training was imposed upon me only because I exercised by First Amendment right in writing the Opinion Piece.

48. The training module for this program tells employees who have become aware that they have "offended" someone to "*start with an apology* [and] stop the offensive behavior immediately." A true, correct, and complete copy of this training module has already been filed as ECF No. 8-18.

49. I would have undergone the training remotely/virtually.

50. Erin New or one of her staff would have been my instructor, and there would have been live interaction between us, as is usually the case in this training.

51. I believe that the training would have forced me to say things that I disagree with and/or to apologize for my views.

52. I – by myself and through counsel – informed the County of the conflict between this training requirement and my religious beliefs three times:

> a. First, on March 19, 2021, my then-counsel, Dennis Grossman, expressed concern to Chief of Staff Lopez and to Ms. Vega that the adverse employment actions – including the extra training – violated my rights of speech and press under the First Amendment. A true, correct, and complete copy of that letter has already been filed as ECF No. 8-10.

    b. Second, on March 26, 2021, Mr. Grossman wrote a similar letter to County Attorney William "Bill" Candela, except that Mr. Grossman added that the adverse employment actions violated my free exercise right, too. A true, correct, and complete copy of that letter has already been filed as ECF No. 8-11.

    c. Finally, I complained to Chief of Staff Lopez on March 27, 2021, that the training constituted discrimination and harassment against me due to my religious beliefs and that my undergoing said training would violate my conscience and betray all other County employees who share those beliefs. A true, correct, and complete copy of that email has already been filed as part of ECF No. 8-7.

53. After I objected to this further punishment, Former Chairman Diaz fired me in a letter dated April 13, 2021. I did not receive this letter until nearly the end of the workday on April 14, 2021, when Mr. Lopez gave it to me after I worked nearly a whole day. A true, correct, and complete copy of the termination letter has already been filed as ECF No. 8-12.

54. HRFEP conducted an investigation to determine whether I was engaging in harassing or discriminatory conduct in the workplace. Erin New – the Director of HRFEP – included the findings of the investigation in a memorandum dated May 4, 2021. A true, correct, and complete copy of the memorandum has already been filed as ECF No. 8-13. According to the memorandum, HRFEP "did not find any evidence to establish that [I] was engaged in any harassing or discriminatory behavior based on any protected characteristic *within the workplace*" after it interviewed all my coworkers in the Media Division. Nonetheless, the memorandum irrationally concluded that my language in the Opinion Piece "did constitute a violation of County policies, including Implementing Order 7-45."

55. The memorandum also reflects the County's strong and impermissible anti-religious bias by citing my stated belief that "there is no such thing as transgender" as a rationale for the adverse employment actions taken against me.

Executed on Aug. 16, 2023, in Inverness, Florida.

/s/ *John Labriola*
John Labriola