**Exhibit 3**

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF FLORIDA

3            CASE NO. 1:22-CV-23196-HUCK/Becerra

4

5   JOHN F. LABRIOLA,

6            Plaintiff,

7      v.

8   MIAMI-DADE COUNTY,

9            Defendant.

10  _____/

11              ZOOM VIDEO DEPOSITION OF

12                  OLGA R. VEGA

13          TAKEN ON BEHALF OF THE DEFENDANT

14

15  DATE:        June 5, 2023

16  TIME:        9:00 a.m.

17  LOCATION:    Remote

18  REPORTED BY: Empire Legal Reporting

19               110 SE 6th Street, Suite 1701

20               Fort Lauderdale, FL 33301

21               (954) 241-1010

22  REPORTER:    John Allard, Court Reporter

23               Notary Public, State of Florida

24

25

```
 1                    A P P E A R A N C E S

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4           ALEXANDER BUMBU, ESQUIRE

 5           Pacific Justice Institute

 6           1021 Ives Dairy Road, Ste 115

 7           Miami, FL 33179-2537

 8           (786) 496-3946

 9           abumbu@pji.org

10

11    ON BEHALF OF THE DEFENDANT:

12           WILLIAM CANDELA, ESQUIRE

13           Dade Co Government Center

14           111 NW 1st Street, Fl 28

15           Miami, FL 33128-1930

16           (305) 375-2147

17           wxc@miamidade.gov

18

19    ALSO APPEARING:

20    Michael Kennedy, Videographer

21    Andrea De Ona, Esquire

22

23

24

25
```

Olga R. Vega taken on 6/5/2023

```
 1                          I N D E X

 2                                          PAGE

 3    DIRECT EXAMINATION

 4       By Mr. Bumbu                        8

 5    CERTIFICATE OF TRANSCRIPTION           65

 6    DEPONENT READ/SIGN LETTER              66

 7    ERRATA SHEET                           67

 8

 9

10

11

12

13                    E X H I B I T S

14       LETTER          DESCRIPTION         PAGE

15         A      Miami Herald Article, 3/5/2021    43

16         B      Disciplinary Action Report/Emails  55

17

18

19

20

21

22

23

24

25
```

```
1              DEPOSITION OF OLGA R. VEGA

2                   JUNE 5, 2023

3

4         THE VIDEOGRAPHER:  We're on record.  We're here

5    today, June 5th.  Actually, my apologies.  Mr. Court

6    Reporter, did you need to get the witness's ID first

7    before we start?

8         THE COURT REPORTER:  Yes.  Ms. Vega if possible,

9    could you produce an identification so I can see it?

10   Okay, tilt it down a bit more.  Okay.

11        THE VIDEOGRAPHER:  Ms. Vega, do you have a driver's

12   license that you can show as proof of ID?

13        THE COURT REPORTER:  Actually, this is fine by me.

14   As long as I see some sort of identification of government

15   ID, that's fine.

16        THE VIDEOGRAPHER:  Okay, I see Olga R. Vega.

17        THE COURT REPORTER:  Okay.  Mr. Videographer and

18   Mr. Peters, you can go ahead and continue.

19        THE VIDEOGRAPHER:  Excellent.  Please stand by.

20   We're on record.  We're here today, June 5th, 2023.  Time

21   on the video monitor is 9:39 a.m., this is the video

22   deposition of Olga R. Vega, case style is John F. Labriola

23   versus Miami-Dade County.  Will counsel please state their

24   appearances for the record?

25        MR. BUMBU:  Good morning.  My name is Alexander
```

Olga R. Vega taken on 6/5/2023

1    Bumbu.  I am the noticing attorney and counsel for the

2    Plaintiff, John F. Labriola.

3         MR. CANDELA:  Good morning.  Bill Candela,

4    Assistant County Attorney on behalf of the Defendant,

5    Miami-Dade County.

6         THE VIDEOGRAPHER:  We will have to do that again,

7    because we can't have the attorney in the shot at all.

8         MR. CANDELA:  Okay.  Bill Candela, Assistant County

9    Attorney for Miami-Dade County.

10        THE VIDEOGRAPHER:  No, we've got to do read-on

11    again, sorry.  My apologies.  All right, please stand by.

12    We're on record, we're here today June 5th, 2023.  Time on

13    the video monitor is 9:40 a.m.  This is the video

14    deposition of Olga R. Vega, case style is John F. Labriola

15    versus Miami-Dade County.  Will counsel please state their

16    appearances for the record?

17        MR. BUMBU:  Good morning.  My name is Alexander

18    Bumbu.  I am the noticing attorney and counsel for the

19    Plaintiff, John F. Labriola.

20        MR. CANDELA:  Good morning.  Bill Candela,

21    Assistant County Attorney on behalf of Miami-Dade County.

22        THE VIDEOGRAPHER:  The court reporter may swear in

23    the witness.

24        THE COURT REPORTER:  Okay, very well.  Ms. Vega,

25    please raise your right hand.  Do you solemnly swear or

Olga R. Vega taken on 6/5/2023

1  affirm that the testimony you're about to give in this

2  cause will be the truth, the whole truth, and nothing but

3  the truth?

4          MS. VEGA:  I do.

5                  (WITNESS SWORN)

6          THE COURT REPORTER:  Okay, you can lower your hand.

7  Please state your full name.

8          THE WITNESS:  Olga R. Vega.

9          THE COURT REPORTER:  Thank you.  And for the

10  record, the court reporter has seen a Miami-Dade County

11  Board of County Commissioners ID verifying it is in fact

12  Olga Vega.

13          I have a brief statement to read, and then I will

14  let everyone begin.  Pursuant to administrative order 2023

15  issued by the Florida Supreme Court on April 6th, 2020,

16  all parties stipulate and agree by video conference

17  technology the witness was identified as Olga Vega, and

18  the witness is placed under oath.

19          This deposition shall be used for all purposes,

20  like other depositions.  Counsel, can you please identify

21  yourselves for the record and state on the record who you

22  represent, and that you agree to the stipulation?

23          MR. BUMBU:  My name is Alexander Bumbu, I represent

24  the plaintiff and I agree to the stipulation.

25          MR. CANDELA:  Bill Candela, Assistant County

1    Attorney, I agree to the stipulation.

2         THE COURT REPORTER:  Okay.  Thank you very much,

3    you may begin.

4         MR. BUMBU:  I actually do have a question, I know

5    that you are also Assistant County Attorney Andrea de Ona

6    there.

7         MR. CANDELA:  Yes.

8         MR. BUMBU:  Does she have to identify herself?

9         MR. CANDELA:  She can introduce herself if you want

10   her to introduce herself.  Okay.  Go ahead, Andrea.

11        MS. DE ONA:  Andrea de Ona on behalf of Miami-Dade

12   County.

13        MR. BUMBU:  Okay.  And that doesn't mess anything

14   up, we don't have to start all over, do we?

15        MR. CANDELA:  I hope not.

16        THE VIDEOGRAPHER:  No, sir.

17        THE COURT REPORTER:  No, not for the court

18   reporter.  We're good.

19        MR. BUMBU:  Okay.  So Mr. Court Reporter, Mr.

20   Videographer, do you guys have anything else?

21        THE COURT REPORTER:  No, you are all set.  You may

22   begin.

23   THEREFORE,

24                    OLGA R VEGA

25      Having been first duly sworn, was examined and

1    testifies as follows:

2                      DIRECT EXAMINATION

3    BY MR. BUMBU:

4      **Q  All right.  Good morning, Ms. Vega.**

5      A  Good morning.

6      **Q  Before I ask any questions, I want to remind you that**

7    **you are under oath and you have an obligation to tell the**

8    **truth, that any false statement that you say could subject**

9    **you to a perjury charge.  Am I clear on that?**

10     A  Yes.

11     **Q  Okay.  So may you please state your full name for the**

12   **record?**

13     A  Olga R. Vega.

14     **Q  And what is your date of birth?**

15     A  (Inaudible) 29, 1972.

16     **Q  Is that June 29th, 1972?**

17     A  No, that's February 29th, 1972.

18     **Q  February 29th, 1972.  May you please speak a little**

19   **louder?**

20     A  Sure.

21     **Q  Okay, all right.  And if anybody has any trouble**

22   **hearing her, let her know or let us know.  What city and**

23   **state are you taking this deposition from?**

24     A  Miami, Florida.

25     **Q  Okay.  And what is your residence?**

1    **Q  And for what time period?**

2    A  I started in 2005, until I came to this position, so

3  about 17 years.

4    **Q  So from 2005 until --**

5    A  2019.

6    **Q  2019, okay.**

7    A  2019, I believe.

8    **Q  2019, okay.  And that would be a period of 14 years,**

9  **correct?**

10   A  Yeah, I'm sorry.  I'm thinking overall in the county.

11   **Q  Oh, okay.  Now what was your relationship with John**

12  **Labriola?**

13   A  I worked with him a lot when I was the director of

14  communications, that's how him and I know each other and he

15  was very good at what he did.  I would, you know, work with

16  him a lot on projects because not only was I the director of

17  communications for Jose Pepe Diaz, but I also had other

18  duties.  So he would assist me with a lot of, you know,

19  speeches or press releases, which included quotes from Jose

20  Pepe Diaz.

21   **Q  Okay.  Now did Mr. Labriola supervise any employees?**

22   A  The time that I was there, no.

23   **Q  Okay.  Did Mr. Labriola -- let me rephrase.  Did Mr.**

24  **Labriola make any policy?**

25   A  No.

Olga R. Vega taken on 6/5/2023

1    **Q   And you said that Mr. Labriola worked on press**

2    **releases, correct?**

3    A   Yes.

4    **Q   Did he draft press releases?**

5    A   He did.

6    **Q   Okay.  Did the press releases bear his name or contact**

7    **information?**

8    A   No.

9    **Q   Did the press releases bear your name and contact**

10   **information?**

11   A   As the executive director of BCC?

12   **Q   Let me rephrase.  So when press releases were issued,**

13   **did they bear your name or contact information or both?**

14   A   But are you saying as the executive director for the

15   board?

16   **Q   Yes.  When you worked in the BCC media division along**

17   **with Mr. Labriola?**

18   A   (Inaudible) for Jose Pepe Diaz, yes.

19   **Q   I'm sorry, but the first few words of that, your**

20   **response, were cut out.**

21   A   I said yes.  When I first went -- at the beginning of

22   Jose Pepe Diaz's term as chairman, they did, yes.

23   **Q   Okay.**

24   A   Because he was in the process of hiring someone else

25   to replace me.

1  **Q  Okay.  And did those press releases bear anyone else's**

2  **name or contact information?  Did you say no?**

3  A  Are you saying on my team?

4  **Q  I'm asking if the press releases bore any one else's**

5  **name and contact information?**

6  A  Not from my team, but from each office where the

7  elected officials, yes.

8  **Q  Okay.  So Mr. Labriola, did he draft press releases**

9  **for the commissioners?**

10  A  Yes.

11  **Q  Okay.  When Mr. Labriola would draft a press release**

12  **for a commissioner, would he work with that commissioner's**

13  **staff?**

14  A  Yes, he would.

15  **Q  And would the commissioner's staff tell Mr. Labriola**

16  **what to write?**

17  A  I think they would tell him what they would like to

18  include if there was legislation, they would forward the

19  legislation piece to him and he would, you know, write it

20  based on the legislation information.  If it was an event

21  and they needed specific information, yes.

22  **Q  So are you saying that the commissioner's staff would**

23  **give him the content of what to write?**

24  A  They would give him probably bullet points.

25  **Q  Okay.  So maybe what -- so would they give him the**

1   topic or topics on what to write on?

2     A   Yes.

3     Q   Okay.  And would Mr. Labriola polish and edit the

4   topics that he was given by commissioner's staff?

5     A   Yes.

6     Q   Okay.  And would the commissioner's staff review Mr.

7   Labriola's drafts?

8     A   Yes.

9     Q   And would the commissioner's staff subject Mr.

10  Labriola's drafts to final review before the press release

11  was issued?

12     A   That's correct, yes.

13     Q   Okay.  So if I -- let me know if I got this straight.

14  Would you say that Mr. Labriola's role in drafting press

15  releases was to polish and edit content that commissioner's

16  staff gave to him?

17     A   No.  I think that his job was to communicate the

18  commissioner's message, and so he would edit it, but John

19  was a very talented writer.  So everybody would always go to

20  him because he was very talented at what he did.

21     Q   Okay.  But would Mr. Labriola insert his views into

22  the press releases?

23     A   I mean, he would come up with quotes for the

24  commissioners.  He did that for Jose Diaz many times, yeah.

25     Q   Okay.  But that's not what I asked.  Would he insert

Olga R. Vega taken on 6/5/2023

```
1    his views into the press releases?

2           MR. CANDELA:  I'm going to object to the form,

3    asked and answered, repetitive.

4       Q  Okay.  Yes, you may answer.  Ms. Vega, you may answer.

5       A  I didn't understand what you were asking, (inaudible).

6       Q  Okay, let me rephrase.  Did Mr. Labriola insert his

7    political views into the press releases?

8       A  I don't think so, no.

9       Q  Okay.  Did he insert his social views into the press

10   releases?

11      A  No.

12      Q  Did he insert his economic views into the press

13   releases?  Did you say no to that last one because I think

14   you got cut off again.

15      A  No.

16      Q  Okay.  So would you describe Mr. Labriola as a

17   wordsmith?

18      A  As a what?  I'm sorry.

19      Q  A wordsmith?

20      A  Can you --

21      Q  A wordsmith is someone who knows how to choose words

22   to pin a topic.

23      A  I mean, he was a very good writer, so yes.

24      Q  Okay.  Was Mr. Labriola the one issuing the press

25   releases?
```

1      A   What do you mean?

2      Q   Like, was he the one who, you know, who clicked the

3   button to issue the press release?

4      A   Oh, to send the releases out?

5      Q   Yes.

6      A   Yes.

7      Q   Yes, okay.   Is there an email account called BCC media

8   at Miami-Dade dot gov?

9      A   Yes.

10      Q   And is that email account the office email address of

11   the media division of the BCC?

12      A   It is.

13      Q   Were press releases issues from that email account?

14      A   Yes.

15      Q   Were press releases issued from Mr. Labriola's work

16   email address?

17      A   Not that I -- I don't think so, no.

18      Q   So when Mr. Labriola sent out the press releases, did

19   he do so through the email account BCC media at Miami-Dade

20   dot gov?

21      A   Yes.

22      Q   Okay.   Was Mr. Labriola a contact person for the media

23   to contact?

24      A   I mean, yes.   We were all contacts for the media to

25   contact because we dealt with the media and requests by the

1  media, so yes.

2  **Q  Okay.  But would he be listed as a contact person for**

3  **the media on the press releases that were issued?**

4  A  No, not on the press releases, but his name was on the

5  website and his contact information was on the website, and

6  he did respond to requests from the BBC media email.

7  **Q  Can you please describe how he responded to the BCC**

8  **request email?**

9  A  If we would get an email from, let's say a reporter,

10  asking to interview one of the commissioners, he would

11  respond and he would forward it to that commissioner's

12  staff.

13  **Q  So was Mr. Labriola intaking these requests and then**

14  **just forwarding them to the respective staff?**

15  A  Yes.

16  **Q  Okay.**

17  A  Or if we would get sometimes emails from residents, he

18  would respond to them as well.

19  **Q  And would he respond to the residents in the same way**

20  **that he responds to the media requests that you just**

21  **described?**

22  A  Yes.  He would respond to the -- well, not

23  necessarily.  Just depended on what the residents were

24  calling about.  Like say it wasn't pertaining to our

25  division, but it was pertaining to another department, he

Olga R. Vega taken on 6/5/2023

 1   would probably respond saying, you know, this is not our

 2   department's -- what we handle, but this is who you should

 3   reach out to.

 4       Q  Okay.  So for both the media and residents, his job

 5   was to forward requests to the proper places?

 6       A  I mean, yes.

 7       Q  Okay.  Other -- let's see.  Other than that, did Mr.

 8   Labriola have any contact with the media?

 9       A  Yes.  He would take phone calls from the media, yes.

10       Q  And what would those phone calls be about?

11       A  It could have been what was on the agenda, was a

12   certain item going to be heard, could have been if they had

13   questions about an agenda item.

14       Q  Okay.  And would you say that the calls that he would

15   take were -- let me rephrase.  Would you say that the calls

16   that he would take from the media area administrative in

17   nature?

18       A  When you say administrative in nature, what do you

19   mean?

20       Q  When I say administrative, like was he just doing

21   things like anything beyond forwarding requests, or anything

22   beyond just telling the requesters what's on the agenda?

23   Was there anything beyond that?

24           MR. CANDELA:  Objection to form, you can answer.

25       A  I mean, didn't -- it could have been, I'm not sure.  I

 1   was with him as the director, I was with him for not too

 2   long, but I worked with him for a long time when I was with

 3   Jose Pepe Diaz's office.

 4       **Q   Okay.  Did Mr. Labriola ever talk to the media as part**

 5   **of his job?**

 6       A   Not while I was the director of the department.

 7       **Q   Okay.**

 8       A   I mean, again, he took calls but if you're saying like

 9   be the spokesperson, I don't think so.

10       **Q   Yeah, I just wanted to -- yeah.  I wanted to know when**

11   **he would talk to the media, would he talk to them in a**

12   **representative capacity for anyone?**

13       A   No.

14       **Q   No, okay.  So he was not a spokesperson for anyone,**

15   **correct?**

16       A   Not during my time there, no.

17       **Q   Okay.  And was he a spokesperson for anyone during the**

18   **time when you were working for Chairman Diaz but before you**

19   **went into the BCC media division?**

20       A   I'm not sure.

21       **Q   Okay, all right.  And while you were the executive**

22   **director of the BCC media division, would Mr. Labriola have**

23   **any contact with the public at large other than the requests**

24   **that you mentioned earlier that he would get, that he would**

25   **answer?  Anything other than that?**

Olga R. Vega taken on 6/5/2023

1        A  I mean, yes.  He would attend the meetings in the

2   chambers, he would attend events.

3        Q  But would he speak to the public in a representative

4   capacity at these events or meetings?

5        A  No.

6        Q  Okay.  Now, Ms. Vega, you recall that Mr. Labriola was

7   suspended for three days for writing his opinion piece,

8   correct?

9        A  Yes.

10       Q  Okay.  Now after Mr. Labriola returned from his

11   suspension, he worked on many press releases and

12   assignments, correct?

13       A  Yes.

14       Q  Okay.  How many press releases did he work on?

15       A  I'm not sure.

16       Q  Not sure.  Let me rephrase that question.  How many

17   press releases did he work on in the period between when he

18   returned from his suspension to when he got fired?

19       A  I'm not sure.  He was my head writer, so I'm sure

20   there was a couple.

21       Q  Okay.  Does 18 sound like a good number?

22       A  Could be, yes.

23       Q  Okay.  Other than the press releases, how many other

24   assignments did he work on between the time when he returned

25   from his suspension until he got fired?

Olga R. Vega taken on 6/5/2023

1    A  I don't recall.  I mean, it's been a while.

2    **Q  Okay.  Now Mr. Labriola had to work with others for**

3  **most or all of his assignments that he did after he came**

4  **back from his suspension, correct?**

5    A  Yes.

6    **Q  So he would -- was he continuing doing things like**

7  **press releases?**

8    A  He was, yes.

9    **Q  Okay.  And did he have to work with you on some of**

10  **those assignments during that period when he returned from**

11  **suspension to when he got fired?**

12    A  Yes.

13    **Q  Okay.  During the time period from when he returned**

14  **from the suspension to when he was fired, was Mr. Labriola's**

15  **work satisfactory and timely?  Can you repeat that again?**

16  **You mouthed something but it wasn't heard.**

17    A  Yes.

18    **Q  And so your answer to that question is yes, just for**

19  **the record.**

20    A  Yes.

21    **Q  Okay.  Would you say that his opinion piece did not**

22  **impede Mr. Labriola's ability to finish his assignments in a**

23  **satisfactory manner?**

24    A  Yes, but it was chaotic in the office.  So it was

25  disruptive to everybody else working there because obviously

1    a lot of staff from the elected official's office, everybody

2    was talking about it.

3         **Q   Okay.  Now when you say that everyone was talking**

4    **about it, can you give me names of people who were talking**

5    **about that opinion piece?**

6         A   I mean, a couple of the staff members came to me and

7    were like, you know, we can't believe it.  Maggie was one,

8    from District 5, that I can recall.  District 4, also

9    stated, can't believe what's going on.

10        **Q   Okay.**

11        A   And obviously, my own staff, you know.

12        **Q   And what were the names of your own staff?**

13        A   Elena Hernandez (ph) and Jada Hall (ph).

14        **Q   Okay.  When you say that the opinion piece was**

15   **chaotic, did it prevent anybody from doing their work**

16   **assignments in a satisfactory way?**

17        A   No, it just was more work for my staff and myself,

18   actually.

19        **Q   How so?**

20        A   We were getting a lot of phone calls from media, but

21   also from, you know, residents.

22        **Q   But it would not impede people's ability to get their**

23   **assignments done, correct?**

24        A   Are you talking about when he was suspended?

25        **Q   Let me rephrase that.  The opinion piece did not**

1   **prevent people from getting their assignments done, correct?**

2          MR. CANDELA:  Object to the form.  Are you

3   referring to the period of time from March 3rd to March 5th

4   or are you referring to the period of time after he was

5   suspended, which you were asking about earlier?

6          MR. BUMBU:  I'm referring to the period from March

7   3rd to the time he was fired on April -- well, until the

8   time he found out he was fired on April 14th.

9   BY MR. BUMBU:

10    A    Well, yes.  Because John was -- I considered John my

11   number 2.  He was there for a long time before I came along,

12   so he knew a lot of things that I was still learning, so I

13   did depend on him a lot.  He dealt with a lot of public

14   records requests which obviously at this point, I couldn't

15   give those to him because some of them were based on him.

16       They were -- so I couldn't really give him that stuff.

17   And I also felt at the time I couldn't really trust him or

18   you know, because I need a number two to kind of help me

19   with dealing with the 13 commissioners, and I just felt he

20   -- a lot of the stuff he was doing, I had to like, pass on

21   to Jada Hall to help me.

22    **Q  Okay.  And just a moment, just one second.  Ms. Vega,**

23   **are you looking at or are you referring to any documents as**

24   **you're answering these questions?**

25    A  No.

1    **Q  Okay.  Are you getting any signals from your attorneys**

2    **as you're answering these questions?**

3    A  No.

4    **Q  Okay.  So did you say earlier Maggie Fernandez was**

5    **talking about the opinion piece?**

6    A  Well, she wasn't happy.

7    **Q  Pardon me?**

8    A  She wasn't happy.

9    **Q  Okay.  And did she complain to you about it?**

10    A  She just said, she's like, I can't believe this.  Very

11    upsetting, along those lines.

12    **Q  Did she explain why she was upset?**

13    A  I think because the words that John used were

14    offensive, she was offended by the words he used, I believe.

15    **Q  Okay.  Did Maggie Fernandez say that she was unable to**

16    **continue her work assignments or finish her work assignments**

17    **because of the opinion piece?**

18    A  Well, Maggie wasn't really our contact for District 5

19    when I came to press releases.  They had another person that

20    dealt with media.

21    **Q  And who was that person?**

22    A  I don't recall her name.  Oh, I think her name was

23    Francesca, not sure.

24    **Q  And Maggie Fernandez was working for then District 5**

25    **Commissioner Eileen Higgins, correct?**

1    A  Yes.

2    Q  Okay.  Did Maggie Fernandez claim that she would not

3  be able to work with Mr. Labriola in the future?

4    A  I don't recall, I don't remember.

5    Q  Okay.  And when Maggie Fernandez complained to you

6  about this, when did she complain to you about this?

7    A  I think it was a day that we were here for the Board

8  of County Commissioners meeting in person.

9    Q  Did she complain to you verbally or by email or by

10  text message or by some other means?

11    A  No, it was verbally.

12    Q  Okay.  And did she also complain to you in writing?

13    A  No.

14    Q  And can you recall where you were when she complained

15  to you?

16    A  Like I said, I think it was in one of the Board of

17  County Commissioners meetings, where maybe I was going in

18  and she was kind of coming out.  It was just in passing,

19  again she said something along the lines of I can't believe

20  it.

21    Q  Okay.  How long did your conversation with her last?

22    A  I don't recall, but I don't think it was that long.

23    Q  Okay.  Did you say earlier that Elena Hernandez

24  complained about the opinion piece?

25    A  She didn't complain, she was just -- obviously,

1　everybody was reading it because it went to everybody's

2　email.  I think people just couldn't believe it, I guess.

3　　**Q  And was everybody reading it precisely because they**

4　**had gotten it all in their inboxes?**

5　　A  Yes.

6　　**Q  Okay.  Now what did Elena Hernandez say to you when**

7　**she complained?**

8　　A  Again, she didn't complain.  She was just -- again,

9　she's part of my team so it was disruptive because everybody

10　was calling, and this was a colleague.

11　　And again, everybody in the office was talking about

12　it and she knew John, and she said something like I can't

13　believe he would use those offensive words.

14　　**Q  Did she ever indicate to you that she would not be**

15　**able to work with Mr. Labriola in the future?**

16　　A  No.

17　　**Q  Okay.  Did anyone indicate that they would not be able**

18　**to work with Mr. Labriola again in the future?  Okay.  Do**

19　**you recall the circumstances of your conversation with Elena**

20　**Hernandez?**

21　　A  I mean, I worked with her so I spoke to her every day.

22　Again, it was crazy for my office.  I don't think we spoke

23　in detail about stuff because she knew I was dealing with,

24　you know, media and public records requests, and trying to

25　keep us functioning.  So -- but again, her reaction was I

1   can't believe it.

2   **Q  Okay.  Did Elena Hernandez tell you I can't believe it**

3   **verbally or in writing?**

4   A  Verbally.

5   **Q  Did you get any written complaints about the opinion**

6   **piece?**

7   A  (Inaudible).

8   **Q  I'm sorry, did you say no?**

9   A  Yeah.

10   **Q  Okay.  So the answer to that question is no, correct?**

11   A  Correct.

12   **Q  Yes, okay.  Did you say earlier that Jada Hall talked**

13   **about the opinion piece?**

14   A  Again, she's part of my team, so we all knew what was

15   going on.  It's not like we had a full discussion on it.

16   She just, you know, again said, you know, I can't believe

17   it.  I think we were all in shock.

18   **Q  And -- okay.  And just to clarify, did Jada Hall ever**

19   **say that she would not be able to work with Mr. Labriola**

20   **again?**

21   A  No.

22   **Q  Okay.  What did Jada Hall say?**

23   A  I mean, pretty much what Elena said, like I can't

24   believe it.  I mean, I couldn't believe it.

25   **Q  And Jada Hall told you this verbally, correct?**

1    A  Yes.

2    **Q  Okay.  And throughout all this, no one ever told you**

3    **that his opinion piece was impeding their duties or impeding**

4    **their ability to get their assignments done satisfactorily?**

5         MR. CANDELA:  Objection to form, asked and answered

6    repetitively.

7    **Q  You may answer.**

8    A  I mean, no but it was -- it just brought a lot more

9    work, you know, to my department.  And it was a pretty new

10   team besides John, John was the only one that was

11   experienced, so I had two other people that had just come on

12   board that were pretty new in my department, as I was.

13        So it was -- things that I typically ask John like,

14   hey where's this or what have we done in the past, just

15   added a lot to everybody's plate.

16   **Q  What extra work did you have to do then, specifically?**

17   A  Well, I had to do the public records requests that

18   were coming in, I had to assign, you know, look over press

19   releases, more speak to the media regarding, you know,

20   requests that were coming in, and just dealt more with, you

21   know, the 13 commissioners, their chief of staff.

22   **Q  Okay.  But was a lot of this extra work due to the**

23   **inquiries that the media were giving you?**

24   A  Yes.

25   **Q  But this extra work was not due to the words of the**

Olga R. Vega taken on 6/5/2023

1   **opinion piece themselves, correct?**

2          MR. CANDELA:   Object to the form.

3     **Q   You may answer.**

4     A   I mean, some of it was because like I said, John would

5   deal with a lot of the public records requests, and then now

6   I -- obviously he couldn't take care of that stuff, I had to

7   do it, and I was trying to build my digital team at that

8   time.   So it kind of took away from trying to organize that.

9     **Q   And this extra work that you say that you got and that**

10  **your team members got, was this only during -- did this**

11  **extra work happen only during the three days that he was**

12  **suspended?**

13    A   Well again, I had to have Jada handle a lot of the

14  things.   She was brought on to do digital, but when this

15  happened with John, I had to pull her from doing digital and

16  other duties to doing more writing.

17    **Q   Okay.   But did that extra responsibility for Jada last**

18  **only those three days that he was suspended or did it last**

19  **into when he returned from suspension?**

20    A   It lasted until he was let go, because I was trying to

21  have her shadow him to see what his other responsibilities

22  were in the office, to have her as a backup.

23    **Q   Okay.   And let me know if I understood you clearly**

24  **here, but how was Jada's ability to shadow Mr. Labriola**

25  **after Mr. Labriola returned from suspension impeded?**

Olga R. Vega taken on 6/5/2023

1    A  Well, she had to stop what she was doing with the

2   digital stuff to learn what he was doing, you know, day by

3   day.  Because again, like I said, John was there for a very

4   long time before I became the executive director, so he knew

5   a lot of things like how to do live streaming, how to do

6   certain things that I needed Jada to, you know, help out

7   with.

8    **Q  But yet didn't you say earlier that when John came**

9   **back from suspension, he was able to do his tasks**

10  **satisfactorily?**

11   A  I mean, yes, he was.  But at that point, I felt like

12  he was not my second.  I couldn't fully -- I kind of lost

13  confidence in him a little bit.

14   **Q  In what sense did you lose confidence in him?**

15   A  Well because as my number 2, I would sometimes talk to

16  him about certain things that pertained to each office that,

17  you know, kept to ourselves.

18    It was -- so I just felt like I couldn't speak to him

19  freely about those things anymore or get his opinion on

20  certain things.

21   **Q  And what were those things specifically?**

22   A  What he thought about, I don't know, certain things.

23  I mean, each office is -- we try not to let other offices

24  know what each office is asking of us to do for them, so

25  it's more like, speaking to him about assignments or you

1  know, what do you think of doing this for this commissioner,

2  that sort of deal.

3    **Q  Okay.  Was Mr. Labriola leaking information from one**

4  **office to the other?**

5    A  Not that I'm aware of, no.

6    **Q  So I'm just trying -- let me rephrase.  How could you**

7  **have lost confidence then, in the ability to keep secret**

8  **what you were doing for the various offices?  I'm sorry --**

9    A  It's not secrets, but it's confidential what each

10  office is asking us to do.  There's certain things that they

11  ask us to do, not to like say that.  Like, certain

12  commissioners do not like other offices to get their press

13  releases.

14    **Q  Okay.  So what did the -- help me understand here.**

15  **What did the opinion piece have to do with the BCC media**

16  **division being less of a firewall in between the various**

17  **offices?**

18        MR. CANDELA:  Object to the form.

19    **Q  You may answer.**

20    A  Well the words that he used in the article were

21  offensive to me, and it just felt like I couldn't -- my

22  number two, I couldn't really speak to him freely about

23  things anymore.

24    **Q  And you could not speak to him freely about those**

25  **things because of what you thought of his words, correct?**

1    **Q   You may respond.**

2      A   I don't know.  Between the media, and some residents

3    calling, I'm not sure.  I mean, it was a couple, maybe.

4    **Q   A couple?  What do you mean by a couple?**

5      A   I mean, there was like regular phone calls, and then

6    the media and residents calling to, you know, complain.

7    **Q   Okay.  About how many phone calls does the BCC media**

8    **division get on an average day?**

9      A   Maybe ten calls, maybe.  A lot of the media does have

10   my cell phone number, so they typically call me on my cell

11   phone.

12   **Q   Okay.  And about how many phone calls per day was the**

13   **BCC media division receiving after Mr. Labriola's opinion**

14   **piece came out?**

15            MR. CANDELA:  Objection.  Are you referring to the

16   period from March 3rd to March 5th or are you referring from

17   March 3rd all the way to the day he was terminated?

18            MR. BUMBU:  I'm referring to the period of March

19   3rd to March 5th.

20   BY MR. BUMBU:

21     A   I don't remember, but I would direct them to call Jose

22   Pepe Diaz's office.  The ones that were calling that were

23   residents.

24   **Q   Okay.  And about how many phone calls per day was the**

25   **BCC media division receiving from March 5th until the time**

1    when John was fired?

2       A  Are we talking about from residents or from media?

3       Q  From both, combined.

4       A  I mean, I think the second day regarding the

5    residents, they were calling Diaz's office.  I was still

6    taking phone calls from the media, so I can't really recall.

7       Q  Okay.  Would you say that there was more disruption

8    after March 5th or in between March 3rd and March 5th?

9       A  I would say between March 3rd and March 5th, in my

10   eyes.

11      Q  Okay.  So would you say that the disruption died down

12   after March 5th?

13          MR. CANDELA:  Object to the form.

14      Q  You may answer.

15      A  I mean, the calls from residents to the BCC, yes.

16   Some still, I was getting media calls.

17      Q  Okay.

18          THE VIDEOGRAPHER:  Apologies to interrupt, but we

19   have about five minutes to change media.

20          MR. BUMBU:  Excuse me?

21          THE VIDEOGRAPHER:  We just need to stop the

22   recording and then start a new recording.  So if it's okay

23   to go off record and start a new recording, that would be up

24   to you.

25          MR. BUMBU:  Yes, I think we should do so now.

1        THE COURT REPORTER:  Do you want to go off record

2    for five minutes, ten minutes?

3        MR. BUMBU:  I want to go off record for however

4    long it takes to change the media.

5        THE COURT REPORTER:  Okay, very well.

6        MR. BUMBU:  We'll do it now.

7        THE COURT REPORTER:  Okay.

8        THE VIDEOGRAPHER:  Give me just a moment.  We're

9    off record, time on the video monitor is 11:01 a.m.

10                      (OFF THE RECORD)

11        THE VIDEOGRAPHER:  We're on record, time on the

12    video monitor is 11:08 a.m.

13    BY MR. BUMBU:

14    **Q   Okay.  This is Alexander Bumbu speaking, attorney for**

15    **the Plaintiff.  I don't know if I have to say that for the**

16    **record, but Ms. Vega, didn't you say earlier that the volume**

17    **of calls from residents dropped between -- excuse me,**

18    **dropped after March 5th?**

19    A   Yes because we started to tell them to call Jose Pepe

20    Diaz's office.

21    **Q   Okay.  And by what amount did that volume of calls**

22    **drop?**

23    A   I don't know.  I mean again, we were still getting

24    some media calls, but for residents they were going to Jose

25    Pepe Diaz's office.

1          MR. CANDELA:  Yes.

2      Q  Okay.  And is the date on -- is this a Miami Herald

3  article?

4      A  Yes.

5      Q  And is the date of this article March 5th, 2021?

6      A  Yes.

7      Q  And is the article entitled  "A Miami-Dade Government

8  Employee Wrote A Slur-Laden Tirade Against Transgender

9  People?"

10     A  Yes.

11     Q  Okay.  So Ms. Vega, did the Miami Herald write an

12 article about Mr. Labriola and his opinion piece on March

13 5th, 2021?

14     A  Yes.

15     Q  Okay.  I'm going to stop sharing.  Okay, all right.

16 So I'm going to ask you about another topic.  Ms. Vega, did

17 any other people from outside the BCC media division that

18 Mr. Labriola worked on -- worked with, excuse me, complain

19 about his opinion piece?  Anybody else?

20     A  To me, no.

21     Q  Okay.  And I just remembered, didn't you say earlier

22 that someone from District 4 complained about his opinion

23 piece?

24     A  Well again, I don't think she complained.  I think the

25 just said something like, you know, I can't believe it.

1    warning?

2       A   Yes.

3       Q   Did you recommend to Chairman Diaz that John be

4    suspended?

5       A   I did not.

6       Q   Did you recommend to Chairman Diaz that John be

7    warned?

8       A   Be what?

9       Q   To be warned?

10      A   I did.   I mean, to do like, you know, don't do it

11   again sort of.

12      Q   Okay.   Did you recommend that to Chairman Diaz that

13   John be ordered to undergo training?   No?   Is that your

14   answer to that question?

15          MR. CANDELA:   Speak on record so he can hear you.

16      A   Oh, yes.

17      Q   Okay.   So let me repeat that question because it seems

18   that you were not -- I did not hear you.   Did you recommend

19   to Chairman Diaz that John be ordered to undergo training?

20      A   No.

21      Q   Did you recommend to Chairman Diaz that John be fired?

22      A   No.

23      Q   Okay.   When Chairman Diaz asked you for your opinion,

24   was that a verbal conversation or in writing?

25      A   No, it was a verbal conversation.

1    **Q   And was it one conversation or multiple conversations?**

2    A   I think it was one conversation.

3    **Q   Okay.  And do you recall where you were physically**

4    **present when you had that conversation with Chairman Diaz?**

5    A   I think I was in his district office.

6    **Q   Okay.  Was there anyone else present when you spoke**

7    **with Chairman Diaz?**

8    A   Isidoro Lopez was there.

9    **Q   And Isidoro Lopez was Chairman Diaz's chief of staff,**

10   **correct?**

11   A   Yes.

12   **Q   Okay.  What did Chairman Diaz say?**

13   A   He knew John and I had a relationship, a working

14   relationship.  I was friends with John.  So he said, look, I

15   don't really know John, what are your thoughts?  And I said,

16   John is a good person, you know, anybody can make a mistake.

17   I said, so can't we just give him a warning not to use those

18   kinds of words and slurs again.  And he said, okay I'll

19   think about it or something along those lines.

20   **Q   Okay.  Anything else?**

21   A   No.

22   **Q   What did Isidoro Lopez say during that meeting?**

23   A   I don't recall him saying anything.

24   **Q   Okay.  During that meeting, did Chairman Diaz mention**

25   **any training of any kind?**

Olga R. Vega taken on 6/5/2023

```
 1                    CERTIFICATE OF TRANSCRIPTION

 2

 3      STATE OF FLORIDA

 4      COUNTY OF MIAMI-DADE

 5

 6          I, SUSAN HEITZ, being an official transcriptionist of

 7      electronically recorded proceedings, do hereby certify that

 8      the conclusive represent a true and correct transcription of

 9      the electronically recorded proceedings which took place on

10      JUNE 5, 2023.

11          I further certify that I am not an employee or relative

12      of any party connected with this action, nor do I have any

13      financial interest in this action.

14

15          SUSAN HEITZ, Official Transcriptionist

16

17

18

19

20

21

22

23

24

25
```